77416. JACOBS et al. v. TAYLOR et al.
77417. JACOBS et al. v. MURRAY et al.
77418. JACOBS et al. v. STARRETT et al.
77419. TAYLOR et al. v. DELATORRE.
77420. MURRAY et al. v. DELATORRE.
77421. STARRETT et al. v. DELATORRE.
(379 SE2d 563)

SOGNIER, Judge.

The children of Marjorie Love Murray, William J. Quinlan, and Roma L. Quinlan, hereinafter referred to collectively as "Taylor," brought suit against seven psychiatrists who had treated or had administrative contact with Ronald Edwin Murray, the murderer of their parents, seeking damages for the doctors' alleged negligence in

allowing Murray to be released, in failing to exercise proper control over Murray, in failing to warn the victims of Murray's release, and in failing to comply with the provisions of OCGA § 37-3-1 et seq. so as to be entitled to the good faith immunity set forth in OCGA § 37-3-4. The trial court denied the motions for summary judgment made by Doctors Louis Jacobs, Lorenzo Lecumberri, and Simon Speriosu, and this court granted their applications for interlocutory appeal in Case Nos. 77416-77418. Cross-appeals were taken in Case Nos. 77419-77421 from the grant of summary judgment in favor of the remaining four doctors, but the notices of appeal in those cases specified the judgment only insofar as Dr. Jose M. Delatorre is concerned. While Taylor acknowledges that no appeal is taken from the grant of summary judgment as to one of the remaining doctors, Taylor included arguments addressing the remaining two doctors in the enumerations and briefs before this court, despite the failure to name them in the notices of appeal. OCGA § 5-6-37. However, in view of the peculiar factual circumstances in these appeals which result in our holdings being directly applicable to the remaining doctors, one a clinical director at Central State Hospital and the other the superintendent at Georgia Regional Hospital, we necessarily address Taylor's arguments in regard to these two doctors as if Taylor had properly presented them as cross appellees in Case Nos. 77419-77421.

The record reveals that Ronald Edwin Murray, having been found not guilty by reason of insanity of the murder of Thomas Allen, was committed to Central State Hospital where he was treated by Jacobs beginning in September 1978. Under the version of OCGA § 17-7-131 applicable to Murray, he was entitled to be released when "the court which committed him finds and determines that [he] does not meet the criteria for civil commitment under Chapter 3 or 4 of Title 37." Former OCGA § 17-7-131 (a). In May 1979, Murray filed a writ of habeas corpus seeking to be released from the hospital. Jacobs and the clinical director at Central State Hospital testified at the hearing on the petition, stating as their medical opinions that Murray did not meet the criteria for civil commitment under the version of OCGA § 37-3 et seq. then applicable, specifically OCGA § 37-3-1 (12). Pursuant to former OCGA § 17-7-131 (b), the Baldwin County Superior Court ordered Murray's release from Central State Hospital.

In March 1980, Murray had himself admitted as a voluntary patient to Georgia Regional Hospital in Savannah. After initially being treated by the doctor no longer involved in this suit, Murray was treated by Lecumberri from mid-March until Murray left the hospital without permission in early April 1980. In his affidavit, Lecumberri stated that because Murray was in the hospital on a voluntary basis, he could be brought back to the hospital on an involuntary basis only if he met the civil commitment criteria. Lecumberri determined that

Murray did not meet the criteria for involuntary commitment, could not be brought back to the hospital involuntarily, and so completed an administrative discharge of Murray on April 8, 1980, after which Lecumberri had no further contact with Murray. On April 2, 1980, after the time Murray left the hospital, Murray allegedly threatened to kill his former wife, Marjorie Love Murray. When Murray returned to the hospital on April 14th to collect his belongings, Speriosu was contacted by the hospital's admissions office to do a psychiatric examination of Murray. In his affidavit Speriosu averred that at that time he found no sign of acute psychosis or suicidal or homicidal ideations in Murray and thus determined that Murray was not dangerous to himself or to others. He therefore determined that Murray did not meet the criteria for civil commitment and should not be admitted to the hospital on an involuntary basis. Speriosu had no further contact with Murray. The records at Georgia Regional Hospital indicate that because the staff was aware Murray had previously been found not guilty of murder by reason of insanity, calls were made to a local judge, Judge Robert Cook, who requested Murray be held, and that Murray left the hospital in the company of a deputy sheriff, who took him to jail. The records also reveal that the superintendent of the hospital during this time, who stated in his affidavit that he had no contact with Murray, could not recall reviewing Murray's record, and neither provided care nor assisted in the diagnosis, treatment, admission or discharge of Murray, did sign a form letter addressed to Judge Cook in which the superintendent stated that Murray was evaluated by hospital staff and the recommendation made by the staff was that hospitalization was not needed at that time, so Murray was released to the municipal court deputies. It does not appear, however, that Murray was incarcerated or otherwise detained by the authorities after his departure from the hospital.

In August 1980, Murray was arrested in Chatham County on charges of making terroristic threats against his former wife stemming from the April 2, 1980 incident. In October 1980, the Chatham County Superior Court, determining that the jail's facilities were not adequate to care properly for Murray, ordered Murray admitted to Central State Hospital, Forensic Services Division, to be treated until he had progressed sufficiently to be returned to the jail. Delatorre evaluated Murray upon his admission and found him to be psychotic, delusional, and disorganized. Delatorre recommended Murray be transferred to a treatment ward, where he came under the treatment of Jacobs, the ward physician. In January 1981, Jacobs recommended that Delatorre reevaluate Murray, who did so and determined Murray was sufficiently improved to be released back to the custody of the Chatham County sheriff's office pursuant to the court's order. Murray was released to the Chatham County jail on January 9, 1981, which is

the last date any of the doctors in this case had any contact with Murray. After the superior court found Murray competent to stand trial on the terroristic threats charge, Murray was tried, acquitted, and released from custody in April 1981. On June 12, 1981, Murray murdered Taylor's decedents.

1. The trial court erred by denying summary judgment in favor of Jacobs, Lecumberri and Speriosu, and acted properly by granting summary judgment in favor of Delatorre and the remaining doctors. Although Taylor argues the doctors are liable for their negligent or recklessly indifferent examinations, diagnoses and treatments rendered Murray, even assuming the care given Murray was negligent and that the doctors knew it was inadequate, the gravamen of Taylor's complaint is that the doctors breached their duty to control Murray by negligently releasing or allowing him to be released, and it is on this issue that Taylor's complaints fall.

(a) As to Murray's September 1978—May 1979 commitment at Central State Hospital, under the law in effect at the time of the facts in this case, "[a] person committed to [a facility such as Central State Hospital] pursuant to this Code section shall not be released from confinement unless and until, after notice and hearing, *the court which committed him finds and determines that the person does not meet the criteria for civil commitment*," in this instance under OCGA § 37-3. (Emphasis supplied.) Former OCGA § 17-7-131 (a). The judge, as the jury and finder of fact, was not bound by the opinions of expert witnesses such as Jacobs and the clinical director who testified at Murray's habeas corpus hearing. See *Moses v. State*, 167 Ga. App. 556, 558-560 (307 SE2d 35) (1983). Indeed, the record reveals that the Baldwin County Superior Court had rejected an earlier application for Murray's release in which Jacobs had likewise testified that Murray did not meet the criteria for civil commitment. Taylor argues that the courts are generally not in a position to evaluate objectively the opinions of psychiatrists and cites *Hicks v. United States*, 511 F2d 407, 415-416 (DC Cir. 1975) for the proposition that a third party's suit against a psychiatrist for injuries incurred by a court-released patient is not barred by the intervening court order where the evidence entertained by the court included testimony by psychiatrists based on their negligent treatment and/or evaluation of the patient. In *Hicks* the hospital was found negligent in its failure to transmit adequate information to the court concerning the patient's mental condition, in that the court was informed in unqualified language that the patient was "recovered." Id. at 415-417. No such "unqualified recovery" language was presented to the Baldwin County Superior Court by Jacobs and the clinical director. Rather, Jacobs and the clinical director both told the Baldwin County Superior Court that Murray, diagnosed as schizophrenic, paranoid type, was in remission; that Murray was able

to care for his own physical health and safety outside a hospital without creating an imminently life-endangering crisis; and that Murray had not exhibited any recent overt acts or recently expressed threats of violence which presented a probability of physical injury to himself or to other persons. *Hicks* is thus factually distinguishable from the case sub judice. Furthermore, this court will not read the statutory responsibility placed on a committing court under OCGA § 17-7-131 as consisting merely of "rubberstamping" the opinions of expert witnesses. Rather, the ultimate decision to release Murray was that of the superior court, and not that of Jacobs and the clinical director. See *Clark v. State*, 245 Ga. 629, 630 (266 SE2d 466) (1980); *Dubose v. State*, 148 Ga. App. 9 (251 SE2d 15) (1978); *Roberts v. Grigsby*, 177 Ga. App. 377, 382 (339 SE2d 633) (1985) (Deen, P. J., concurring specially).

(b) As to the January 9, 1981 release of Murray from Central State Hospital back to the custody of the Chatham County sheriff's department, the record reveals that Jacobs and Delatorre acted pursuant to court order by treating Murray until he had "progressed sufficiently to be returned to the Chatham County Jail. . . ." There is no evidence that Jacobs or Delatorre negligently performed their court-ordered task or that they were charged to perform any tasks above and beyond that contained in the court's order, and thus we reject Taylor's argument that the doctors can be held to have incurred liability for taking "the most narrow of all possible interpretations of the order under which Murray had been sent" to Central State Hospital. The release of Murray uncontrovertedly did not constitute a release of the man into the community in general or even into a place where Murray had access to Taylor's decedents. In *Bradley Center v. Wessner*, 250 Ga. 199 (296 SE2d 693) (1982), the Supreme Court held that to state a cause of action based on the breach of a duty to control the conduct of third persons to prevent them from causing physical harm to others, the essential elements are the traditional tort principles of: " '(1) A legal duty to conform to a standard of conduct raised by the law for the protection of others against unreasonable risks of harm; (2) a breach of this standard; (3) a legally attributable causal connection between the conduct and the resulting injury; and, (4) some loss or damage flowing to the plaintiff's legally protected interest as a result of the alleged breach of the legal duty.' [Cit.]" Id. at 200. However, where the legal duty placed on the doctors was to treat Murray until he had progressed sufficiently to be returned to jail, and where their treatment accomplished that precise goal, we do not agree with Taylor that the law in general placed a broader and more burdensome duty on these doctors than the one they were given pursuant to court order.

(c) Unlike the other two releases at issue in this case, the record

fails to reflect that Murray's release from his voluntary stay at Georgia Regional Hospital was sanctioned by court order. What the record does show is that Murray was a patient at the hospital for barely over a month, that he was at liberty for several months before he was indicted and placed into custody in regard to the terroristic threats charge, that he was then evaluated and treated by doctors at another hospital, that he was found competent to stand trial by a court of this state, that he was tried and acquitted of the charge by a jury of his peers in April 1981, and that he was again at liberty for roughly six weeks before he murdered Taylor's decedents a year and two months after his last contact with the doctors at Georgia Regional.

Taylor would have this court hold that once a duty to control arises, all temporal considerations are irrelevant and that no amount of time or intervening experiences can abrogate the liability of a psychiatrist who breaches his or her duty to control a mentally ill patient. However, the Supreme Court stressed in *Bradley Center*, supra, that it was not creating a "new tort" but instead was applying traditional tort principles of negligence. Id. at 202. Thus, Taylor's argument that the fourteen month interval between Murray's release and the murders as well as Murray's intervening incarceration, treatment, trial, and acquittal are of no consequence is not well taken since it is well established that " ' "[t]o state a cause of action for negligence, there must be a legally attributable causal connection between the defendant[s'] conduct and the alleged injury." [Cits.] The inquiry is not whether the defendant[s'] conduct constituted a cause in fact of the injury, but rather whether the causal connection between that conduct and the injury is too remote for the law to countenance a recovery. [Cit.] In Georgia, questions of negligence and proximate cause are ordinarily reserved for the jury, but in plain and undisputed cases the court may make a determination as a matter of law. [Cits.]' [Cit.]" *Southern Bell Tel. &c. Co. v. Dolce*, 178 Ga. App. 175, 176 (1) (342 SE2d 497) (1986).

" 'In order to hold the [doctors] liable, it must be shown "either that the act complained of was the sole occasion of the injury, or that it put in operation other causal forces, such as were the direct, natural, and probable consequences of the original act, or that the intervening agency could have reasonably been anticipated or foreseen by the ([doctors] as the) original wrongdoer[s]." ([Cit.]' [Cit.])" *Stapleton v. Amerson*, 96 Ga. App. 471, 472 (2d) (100 SE2d 628) (1957). "Negligence is not actionable unless it is the proximate cause of the injury complained of. [Cits.] 'The question of proximate cause depends upon the facts of each particular case, and, in ascertaining in a particular case what was the proximate cause of the injury, the conclusion reached depends upon whether the injury alleged was such a natural and probable consequence, under the circumstances of the

case, as that it might and ought to have been foreseen by the wrong-doer as likely to ensue from his act.' [Cits.] '(A) wrongdoer is not responsible for a consequence which is merely possible, according to occasional experience, but only for a consequence which is probable, according to ordinary and usual experience. The natural and probable consequences are those which human foresight can foresee, because they happen so frequently that they may be expected to happen again. The possible consequences are those which happen so infrequently that they are not expected to happen again. *A man's responsibility for his negligence must end somewhere.*' [Cit.]" (Emphasis supplied.) *Rustin Stamp &c. v. Ray Bros.*, 175 Ga. App. 30, 31-32 (1) (332 SE2d 341) (1985).

"All the past is a part of the cause of every present effect. The courts can deal with that great body of cause only as it relates to human activity; and a particular court dealing with a particular case must as a practical necessity isolate the activities near by to the effect in question, and from these must make the juridic determination of responsibility. . . . [T]o judge the transaction according to the natural probabilities which men's minds take as the basis for passing judgment upon the course of human affairs, it may appear that causes other than the negligent one referred to so preponderated in bringing about the result as to lead us to say, from a human point of view, that the injury was just as likely to have ensued (with only its details somewhat varied, perhaps) if the negligent thing had not occurred. In such cases we exempt the author of the negligence from liability." *Atlantic Coast Line R. Co. v. Daniels*, 8 Ga. App. 775, 779-780 (70 SE 203) (1911).

We therefore hold that the trial court properly granted summary judgment in favor of the four doctors in Case Nos. 77419-77421 and erred by denying summary judgment in favor of Jacobs, Lecumberri and Speriosu in Case Nos. 77416-77418 on Taylor's allegation that the doctors breached their duty to control Murray.

2. " 'To prevail on motion for summary judgment, the movant has the burden to produce evidence which conclusively eliminates *all* material issues in the case.' [Cit.]" (Emphasis supplied.) *Kohlmeyer & Co. v. Bowen*, 130 Ga. App. 386, 387 (4) (203 SE2d 630) (1973). Although Taylor's arguments on appeal are directed to the allegation that the doctors breached a duty to control Murray, Taylor also alleged in the complaints that the doctors breached a duty to warn Taylor's decedents, Marjorie Murray, William Quinlan and Roma Quinlan, about Murray's murderous tendencies. As to Marjorie Murray, the record supports Taylor's assertion that certain of the doctors were aware that the hostilities Murray manifested were directed toward his former wife. However, while the record does not indicate that any of the doctors specifically warned Marjorie Murray, the rec-

ord does reveal that Marjorie Murray was fully cognizant of the danger Murray presented and had instituted criminal proceedings based on Murray's alleged statements in April 1980 that he would kill her.

"There is no duty to warn of the obvious, or of that which the plaintiff already knew or should have known. [Cits.]" *Roberts v. Bradley*, 114 Ga. App. 262, 263 (150 SE2d 720) (1966). Construing the evidence most strongly on behalf of Taylor, it appears that even if certain doctors at one point in time had a duty to warn Marjorie Murray about the danger her former husband posed, Marjorie Murray's own subsequently acquired knowledge of that precise danger absolved the doctors of any liability in their failure to so warn her. "[I]t is hornbook law that an action in tort requires one to allege a duty, a breach of that duty, and damages proximately flowing from that breach." *Green Property Corp. v. O'Callaghan &c.*, 177 Ga. App. 686, 687 (1) (340 SE2d 652) (1986). Since the doctors were not legally required to warn Marjorie Murray of the precise danger to which she was already fully aware, the doctors were entitled to summary judgment on that allegation in Taylor's complaints.

It does not appear of record that William and Roma Quinlan were related to Murray, or that they were even acquainted with him. Further, while it appears Murray made threats towards unspecified others, the only specific person Murray ever expressed hostilities toward was his former wife, Marjorie Murray. No evidence is present in the record that the Quinlans were foreseeable or readily identifiable targets of Murray's threats. We are thus persuaded by the reasoning in *Thompson v. County of Alameda*, 614 P2d 728, 732-736 (SC Cal. 1980), not to impose a blanket liability on the doctors for failing to warn members of the general public, such as the Quinlans, of the risk posed by Murray, a patient with a history of violence who made generalized threats at some time during his treatment by the doctors.

3. Our holdings above render it unnecessary for us to determine whether the doctors were entitled to immunity under OCGA § 37-3-4 or any other provision.

*Judgments affirmed in Case Nos. 77419-77421; judgments reversed in Case Nos. 77416-77418. Carley, C. J., concurs. Deen, P. J., concurs specially.*

DEEN, Presiding Judge, concurring specially.

Other than acknowledging that *Rustin Stamp &c. v. Ray Bros.*, 175 Ga. App. 30, 31-32 (1) (332 SE2d 341) (1985), cited in the majority opinion is without precedential value, I concur fully with the majority opinion.

Decided February 17, 1989 —
Rehearing denied March 1, 1989 —

*Michael J. Bowers, Attorney General, H. Perry Michael, First Assistant Attorney General, William C. Joy, Senior Assistant Attorney General, Mary Foil Russell, Assistant Attorney General, Thomas J. Mahoney, Jr., Special Assistant Attorney General*, for Jacobs et al.

*Karsman, Brooks, Painter & Callaway, James L. Drake, Jr., David H. Connolly, Jr., Edward M. Hughes*, for Taylor et al.