A90A1905. GEORGIA OSTEOPATHIC HOSPITAL, INC. v. O'NEAL et al.
(403 SE2d 235)

BANKE, Presiding Judge.

The appellees sued the appellant, Georgia Osteopathic Hospital, Inc. d/b/a Doctors Hospital, seeking damages for the death of their father, George O'Neal, who was killed by police after he "went berserk" and began attacking people with a knife while a patient at the hospital. The appellees also sought to recover actual and punitive damages for the pain and suffering allegedly experienced by O'Neal before he died. A jury returned a verdict in their favor in the amount of $550,000, and the case is before us on appeal from the denial of the hospital's alternative motions for new trial and judgment notwithstanding the verdict.

The decedent was originally admitted to the hospital by Dr. Schnapp on November 22, 1983, with complaints of head and neck pain. During the course of that stay, a neurological evaluation was performed on him by Dr. Lara, who determined that he was suffering from neurovascular and muscle-contraction headaches. The decedent was discharged from this hospitalization on December 6, 1983, after a course of treatment which included physical therapy and the administration of various medications for inflammation, pain, and muscle tension. However, he continued to complain of neck and head pain and also began to report numbness in his right hand. Consequently, on December 12, 1983, he was readmitted to the hospital by Dr. Boecker, who was Dr. Schnapp's partner or associate. Because the decedent was additionally exhibiting symptoms of hypertension at this time, there was some concern that he might be a candidate for a stroke. During the course of the following three days, numerous central nervous system depressant drugs — specifically Tigan, Nubain, Flexeril, Indocin, Halcion, Robaxin, Dalmane, Soma, and Haldol — were administered to the decedent. The appellees presented opinion testimony from a psychiatrist, Dr. James S. Cheatham, to the effect that the co-administration of these drugs precipitated an "anti-cholinergic drug reaction" in the decedent which ultimately caused him to go "berserk."

The hospital records indicate that the nursing staff first became

concerned about the decedent's behavior at approximately 12:25 a.m. on December 15, which was about 20 hours prior to the violent outburst which led to his death. It was noted on his chart at this time that he was exhibiting an "inappropriate laugh" and that he was refusing to take his medications for the stated reason that they were aggravating his pain. During the ensuing hour-and-a-half, notations were made that he had complained of feeling short-winded and of experiencing numbness "in the back of his head" and that he had been observed kneeling over his bed. At 2:10 a.m., he appeared anxious and again refused his medication, prompting his nurse to notify the house intern, Dr. Newlon. After examining the decedent, Dr. Newlon telephoned the admitting physician, Dr. Boecker, at home and was instructed by the latter to discontinue several of the decedent's medications.

The morning shift nurse, Ms. McKenzie, observed that the decedent appeared confused and disturbed; and she was sufficiently concerned about his condition that she spent several hours with him during her shift attempting to reassure and comfort him. The decedent made repeated complaints during this period to the effect that he did not think "all this medication" was helping him, and he threatened at one point to leave the hospital. Nurse McKenzie called Dr. Boecker several times to express concern about the situation, and he visited the decedent at 12:40 p.m. Observing that the decedent exhibited an "inappropriate affect and uncharacteristic confusion regarding time and events," Dr. Boecker called in Dr. Lara, the neurologist who had examined him during his previous hospital stay, for a consultation. Dr. Lara examined the decedent at about 2:00 that afternoon and concluded that he was "suffering from a confusional state secondary to medication effect." However, he testified at trial that he did not feel the decedent was dangerous at this time.

By 3:00 p.m., Dr. Boecker had discontinued all of the decedent's prior medications, prescribing only Haldol, an anti-psychotic drug, on an as-needed basis. The nurse assigned to care for the decedent on the three-to-eleven shift was Ms. Daryle Branch, a licensed practical nurse who normally worked on the obstetrics ward. At 6:00 p.m., she made the following notation in his record: "Remains confused. He's been up walking in the room." Nurse Branch made her next entry in the decedent's hospital record at 10:00 p.m., at which time she described him as "resting quietly" in bed with his eyes closed. Asked at trial to describe his behavior during the interim, Nurse Branch testified as follows: "[H]e was calm, he was quiet. . . . He was conversing . . . probably, with his roommate . . . but nothing else was taking place; he was walkin' around, he was watchin' TV . . . you know, nothing out of the ordinary."

At approximately 10:15 p.m. the decedent called the nurses' sta-

tion and asked for someone to come and look at his arm. Nurse Branch responded and found him sitting in a chair beside his bed. When she touched his arm, he jumped back in a manner which she evidently found alarming, prompting her to tell him she would have someone else look at his arm. The decedent replied, "Well, I'm gonna die anyway," and then grabbed an object (which proved to be a pocketknife) and charged at her with it. Although Ms. Branch escaped uninjured, the decedent ultimately stabbed and wounded another nurse, a security guard, and himself before the DeKalb County police arrived and shot him to death in the hallway.

None of the physicians who examined the decedent between his admission to the hospital on December 12 and his death on December 15 was named as a defendant in this action, and none of them was employed by the hospital except for Dr. Newlon, who is not alleged to have been negligent in any way. The appellees' claim against the hospital is predicated on allegations that (1) its pharmacy was negligent in failing to monitor the various medications being provided to the decedent for possible adverse interactions; (2) its nurses were negligent in failing to keep the decedent's physicians as well as their own superiors at the hospital adequately informed about his deteriorating condition; and (3) the nurses were further negligent in failing to apply physical restraints to him before he went berserk. In addition, the appellees sought to prove (4) that Nurse Branch had given the decedent a discontinued drug, Dalmane, approximately a half hour before he went berserk. The appellees' psychiatric expert, Dr. Cheatham, characterized Dalmane as a "very potent central nervous system depressant drug" and testified that if it was in fact administered on the night of December 15 it "was probably the straw that broke the camel's back."

During the trial, Ms. Branch testified that she had not administered Dalmane to the decedent on the night of December 15 but had administered it to him only on the previous night, before it was discontinued. However, she acknowledged having previously testified, during the course of a pre-trial deposition, that she had given him the drug on the night of December 15. It was shown that after consulting with the hospital's attorneys during a break in this deposition, Ms. Branch had sought to correct this "mistake" by submitting an "errata sheet" stating that she had actually administered Dalmane to the decedent on December 14 rather than on December 15. *Held*:

1. The hospital contends that the trial court erred in allowing the appellees' claims for the decedent's pain and suffering and funeral expenses to be submitted to the jury because only the decedent's estate had standing to pursue these claims, and no administrator or executor had been appointed to represent the estate. In the recent case of *Walden v. John D. Archbold Mem. Hosp.*, 197 Ga. App. 275, 277 (3)

(398 SE2d 271) (1990), this court held that "[u]nder the plain language in OCGA §§ 9-2-41 and 51-4-5 (b), upon the death of [the decedent] these causes of action vest[ ] in the administrator of his estate, not . . . [in his] heirs and next of kin." Based on this holding, the appellees now concede that "any damages awarded on their pre-death tort claims would have to be reversed." However, they urge this court to presume that no such damages were awarded by the jury because it returned a lump sum verdict of $550,000, without specifying that any portion of it was for the pre-death tort claims. This is, of course, precisely the problem. Because the verdict is not itemized, it is impossible to ascertain whether it did or did not include damages for the predeath tort claims. Therefore, we have no basis upon which to conclude that the court's action in allowing these claims to go to the jury was harmless error, and a new trial is required.

2. Since punitive damages are not available in a wrongful death action, *Truelove v. Wilson*, 159 Ga. App. 906, 907 (2) (285 SE2d 556) (1981), it follows from the foregoing that the appellees were without standing to pursue such damages. Accordingly, we do not reach the issue of whether there was evidence of any wilful or malicious misconduct or conscious indifference to consequences in this case, such as would have authorized an award of punitive damages on the "predeath" tort claims. See generally *Associated Health Systems v. Jones*, 185 Ga. App. 798 (2) (366 SE2d 147) (1988).

3. The hospital contends that under the Supreme Court's decision in *Bradley Center v. Wessner*, 250 Ga. 199 (296 SE2d 693) (1982), it could not be charged with a duty to control the decedent's behavior because he was not a mental patient. The issue in *Bradley Center v. Wessner* was whether a mental health hospital could be held liable for the death of a third party at the hands of one of its patients based on evidence that it had failed to exercise reasonable care in controlling the patient's conduct, where no privity had existed between the decedent and the hospital. In the present case, privity obviously did exist between the decedent and the hospital. Therefore, the *Bradley Center* theory of liability has no applicability here. Rather, the hospital's duty was "that enunciated in *Emory Univ. v. Shadburn*, 47 Ga. App. 643 (1) (171 SE 192) (1933), aff'd 180 Ga. 595: 'A private hospital in which patients are placed for treatment by their physicians, and which undertakes to care for the patients and supervise and look after them, is under the duty to exercise such reasonable care in looking after and protecting a patient as the patient's condition . . . may require. This duty extends to safeguarding and protecting the patient from any known or reasonably apprehended danger from himself which may be due to his mental incapacity, and to use ordinary and reasonable care to prevent it. [Cits.]" *Brandvain v. Ridgeview Inst.*, 188 Ga. App. 106, 112 (2) (372 SE2d 265) (1988),

aff'd 259 Ga. 376 (382 SE2d 597) (1989).

4. The hospital contends that there was no evidence that the decedent's death was proximately caused by any act or omission on the part of any of its employees. We agree that the evidence would not have supported a finding of liability under the first theory of liability advanced by the appellees, i.e., that the hospital pharmacy was negligent in failing to monitor the decedent's medications for possible adverse interactions. All of the medications being administered to the decedent had been prescribed by his attending physicians, and there is no suggestion that the pharmacy made any mistake in filling these prescriptions. Clearly, the pharmacy staff was in no position under the circumstances to override or second-guess the medical judgment of the decedent's physicians as to what drugs were appropriate for him. Cf. *Hawkins v. Richardson-Merrell, Inc.*, 147 Ga. App. 481, 483 (249 SE2d 286) (1978). While the appellees' psychiatric expert, Dr. Cheatham, insisted that the hospital pharmacy did have a duty to monitor the decedent's medications for potential interactions, and while he further testified that he "saw no indications" that the pharmacy had fulfilled this duty, he offered no opinion whatever as to which, if any, of the decedent's various prescriptions the pharmacy should have objected to or refused to fill. Under the circumstances, we hold that the conclusory testimony of this witness to the effect that the pharmacy personnel breached a general duty to monitor the decedent's medications was insufficient to support an award of damages against the hospital.

5. The evidence similarly did not support an award of damages against the hospital based on the failure of its nurses to communicate with the decedent's physicians or with their own superiors regarding the decedent's behavior. It is apparent without dispute that the admitting physician, Dr. Boecker, was notified of the nurses' concerns regarding the decedent's behavior on several occasions during the 24-hour period prior to his death and that he in fact arranged for a neurological consultation less than eight hours prior to the decedent's death in an effort to determine the cause of his behavioral abnormalities. The neurologist, Dr. Lara, testified he did not consider the decedent to be dangerous at the time he examined him.

Although nurse Branch's notes indicate that the decedent was continuing to act "confused" several hours later, there is absolutely no evidence that his condition had changed significantly from what it was at the time of Dr. Lara's examination. More importantly, there was no evidence that the decedent ever, at any time prior to the sudden outburst which led to his death, either engaged in or threatened to engage in hostile behavior. Under these circumstances, there is simply no evidentiary basis for a conclusion that his death was proximately caused by a failure on the part of the nursing staff to commu-

nicate accurate information regarding his condition. Compare *Hodges v. Effingham County Hosp. Auth.*, 182 Ga. App. 173 (355 SE2d. 104) (1987) (where there was evidence that the patient's death from heart failure could have been prevented but for the failure of emergency room nurses to disclose to the physician who was attempting to direct the patient's treatment over the telephone that the patient had a heart condition, was complaining of stomach pain, and had taken a nitroglycerin pill shortly before arriving at the emergency room); *Richmond County Hosp. Auth. &c. v. Dickerson*, 182 Ga. App. 601 (356 SE2d 548) (1987) (where the decedent died of an aneurism following an eight-hour wait in the emergency room, during which period the emergency room personnel allegedly failed to monitor his vital signs and report that information to his physician).

6. With regard to the nursing staff's failure to place physical restraints on the decedent — i.e., to strap him to a chair or bed — we find no evidence of any conduct on his part which would have authorized the nurses to take such action. As previously indicated, there was no evidence that the decedent had engaged in any overt acts or threats of violence towards anyone, including himself, prior to the conduct which led to his death, and nurse Branch testified without dispute that he was "calm" and "quiet" during the hours immediately prior to the attack. Compare *Emory Univ. v. Shadburn*, supra, 47 Ga. App. 643; *Emory Univ. v. Lee*, 97 Ga. App. 680 (104 SE2d 234) (1958); *Brandvain v. Ridgeview Inst.*, supra, 188 Ga. App. 106. Indeed, had the members of the nursing staff taken it upon themselves to strap the decedent to his bed under these circumstances, without any direction by his physicians to do so, the hospital might well have found itself defending a suit based on that conduct. Cf. OCGA § 37-3-165 (b) (which provides that personnel of mental health facilities may authorize the application of physical restraints to patients only in emergency situations and only pursuant to written policies and procedures "which clearly delineate, in descending order, the personnel who can authorize the use of [such] restraints. . . .").

7. The jury was, however, authorized to return a verdict against the hospital based on nurse Branch's deposition testimony that she had given the decedent Dalmane, a discontinued central nervous system depressant drug, approximately a half hour before he went berserk. As previously indicated, Dr. Cheatham testified that if in fact Dalmane was administered to the decedent at that time, it was the "straw that broke the camel's back." There can be no question that hospital nurses are under a duty to refrain from giving patients unauthorized medications; and under *Gibbons v. State*, 248 Ga. 858, 862 (286 SE2d 717) (1982), "a prior inconsistent statement of a witness who takes the stand and is subject to cross-examination is admissible as substantive evidence, and is not limited in value only to impeach-

ment purposes."

We must reject the hospital's rather remarkable contention that the errata sheet submitted by nurse Branch following the break in her deposition "negated any testimony regarding the. giving of the medication on December 15th." The jury was authorized to conclude from the portions of nurse Branch's deposition which were read to it during the trial that her original testimony in this regard had not been the product of confusion about the dates but that she had fully intended to testify that she administered Dalmane to the decedent at 9:45 p.m. *on the night he died.* The appellant has provided us with no authority for the proposition that substantive deposition testimony may be erased from the record through the mere submission of an errata sheet, and we certainly do not intend to create any. Cf. OCGA § 9-11-32 (d) (4).

Although the appellant further contends that the hospital records conclusively support Ms. Branch's trial testimony that she administered Dalmane to the decedent on the night of December 14 rather than the night of December 15, there is in fact an entry for Dalmane appearing on the nurses' notes for the 15th, albeit with a line drawn through it and the notation, "D/C" (for discontinued), written beside it. Under the circumstances, it was within the jury's province to determine whether this entry contradicted or supported the witness' original deposition testimony.

8. Since it was apparent even before nurse Branch began her trial testimony that she intended to disavow her original deposition testimony, the trial court did not abuse its discretion in allowing the appellees to call her as an adverse witness, so as to permit them to begin cross-examining her immediately regarding her deposition. "[A] party may use a prior inconsistent statement made by his own witness both to impeach the witness and as substantive evidence without showing surprise." *Williams v. State,* 251 Ga. 749, 800 (312 SE2d 40) (1983).

9. The hospital contends that the decedent's death at the hands of the police must, as a matter of law, be considered the proximate result of "his own conduct in ignoring the commands of the police officers to drop his knife and continuing to advance with knife in hand upon the police officers." We disagree.

" ' "In order for a party to be liable . . . for negligence, it is not necessary that he should have been able to anticipate the particular consequences which ensued. It is sufficient, if in ordinary prudence he might have foreseen that some injury would result from his act or omission, or that consequences of a generally injurious nature might result. (Cits.)" ' *Milton Bradley Co. v. Cooper,* 79 Ga. App. 302, 307 (53 SE2d 761) [1949]." *Lewis v. Harry White Ford, Inc.,* 129 Ga. App. 318, 320 (199 SE2d 599) (1973). See generally *Atlanta Obstetrics &c. Group v. Coleman,* 260 Ga. 569 (398 SE2d 16) (1990). The jury was

authorized to conclude from the evidence in this case that the decedent's violent outburst had resulted from a drug-induced delirium or psychosis precipitated by the negligent administration of a drug which had been discontinued by his treating physician. While it may not have been foreseeable that the decedent would respond to the drug by attacking people with a knife or he would be shot to death by police as a result of that behavior, it was certainly foreseeable that the negligent administration of an inappropriate medication might result in injury to him.

The hospital's reliance on *Strickland v. DeKalb Hosp. Auth.*, 197 Ga. App. 63 (397 SE2d 576) (1990), as authority for a contrary holding is misplaced. The plaintiff in that case shot and killed his wife after having received Valium and Demerol at a hospital emergency room while being treated for a dislocated shoulder. The shooting had occurred off the hospital grounds, and the plaintiff had been convicted of murder as a result of it. Nevertheless, he subsequently filed suit against the hospital and the treating physician, contending "that the sole proximate cause of the injury sustained when he . . . shot his wife 'was the incapacitating effect of the drugs which had been administered to (him) shortly before at [the hospital] . . . and the failure thereafter to adequately supervise [him] while (he was) under the influence of the drugs.' " Id. at 66-67. This court affirmed a grant of summary judgment to the defendants in that action, holding that the causal connection between the medical treatment received by the plaintiff at the hospital and his conduct in shooting his wife was too remote to countenance a recovery. The present case is clearly distinguishable from *Strickland* in that it was established without dispute in the present case that the decedent's violent conduct was not criminal but was in fact the product of a drug-induced delirium or psychosis.

10. The hospital contends that the trial court erred in refusing to submit to the jury the issue of whether the decedent was survived by a common-law wife. If he was, then she, rather than his children, had exclusive standing to bring the wrongful death action. See OCGA § 51-4-2 (a); *Mack v. Moore*, 256 Ga. 138 (345 SE2d 338) (1986).

The putative wife, Tiny Pruitt (a/k/a Tiny Pruitt O'Neal), testified that she and the decedent had lived together continuously from 1974 until his death and had held themselves out as husband and wife during that period. She stated she had used the name O'Neal "when we was gettin' stuff together" and that "we stayed together so long dey just considered us married, so I used it then." She conceded, however, that some people in the neighborhood still called her Pruitt and that she and the decedent had "talked some about getting married . . . [b]ut . . . never did it. . . . ."

In order for a common-law marriage to come into existence, the

parties must be able to contract, must agree to live together as man and wife, and must consummate the agreement. See OCGA § 19-3-1; *Fireman's Fund Ins. Co. v. Smith*, 151 Ga. App. 270 (1) (259 SE2d 675) (1979). "Whether a man and a woman have entered into a common law marriage is a question of fact." *Taylor v. Taylor*, 243 Ga. 506, 508 (255 SE2d 32) (1979). " '[T]he . . . fact of cohabitation is treated as essential, if not the main factor in establishing in this State a common-law marriage.' " *Fireman's Fund Ins. Co. v. Smith*, supra, 151 Ga. App. at 271.

There clearly is evidence in this case to support a finding that the decedent and Ms. Pruitt routinely held themselves out as man and wife while cohabiting as such, and there is no suggestion that any legal impediment existed to their ability to contract a marriage. Ms. Pruitt's statement that she and the decedent had "talked some about getting married . . . [b]ut . . . never did it . . ." does not necessarily negate the existence of a common-law marriage relationship, for a couple may enter into such a relationship yet nevertheless discuss and plan a marriage ceremony for the purpose of formalizing the arrangement. Accord *Brown v. Carr*, 198 Ga. App. 567 (__ SE2d __) (1991). See also *Bolden v. Southerland*, 127 Ga. App. 71 (192 SE2d 718) (1972). We hold that Ms. Pruitt's testimony provided sufficient evidence of a common-law marriage to warrant sending the issue to the jury and that the trial court accordingly erred in declining to do so. Accord *Kickasola v. Jim Wallace Oil Co.*, 144 Ga. App. 758 (1) (242 SE2d 483) (1978).

11. The hospital contends that the trial court erred in refusing to allow the forensic pathologist who had performed the autopsy on the decedent to state whether, in his opinion, Dalmane would have "showed up" on the drug screening test which he had commissioned in connection with the autopsy had that drug been administered to the decedent between 9:00 and 10:00 p.m. on December 15, 1983. It was shown that the pathologist had given the toxicologist a list of medications to test for but that Dalmane was not on this list. Although the pathologist was allowed to testify that the drug screening test had not revealed the presence of Dalmane in the decedent's blood, he was not allowed to state whether he "would . . . have expected it to turn up" if it had been administered to him "about an hour before [he] went berserk." Inasmuch as the pathologist's answer to this question would have been both irrelevant and misleading in the absence of evidence that the decedent's blood had actually been tested for Dalmane, we find no error.

12. The hospital complains that the trial court improperly prevented it from cross-examining the appellees' medical expert, Dr. Cheatham, regarding his alleged failure to order physical restraints for one of his former patients who had committed suicide after being

admitted to a psychiatric hospital. The incident in question, which was unrelated to the present case, had resulted in Dr. Cheatham's being sued for medical malpractice; and he had been represented in that action by the same law firm which was now representing the appellant hospital. The trial court ruled that to permit the hospital's counsel to attempt to impeach its former client by cross-examining him about the incident would be violative of the attorney-client relationship. The hospital contended, however, that Dr. Cheatham had waived the privilege by responding to questions on the same subject during the trial of a previous action against it arising out of Mr. O'Neal's death. Dr. Cheatham explained during the trial of the present case that he had not been aware during the previous trial that he was entitled to invoke the attorney-client privilege with respect to this line of questioning.

Ethical Consideration 4-5 of the Code of Professional Responsibility specifies: "A lawyer should not use information acquired in the course of the representation of a client to the disadvantage of the client and a lawyer should not use, except with the consent of his client after full disclosure, such information for his own purpose." We must presume that, in defending Dr. Cheatham against the malpractice claim arising from the incident in question, the hospital's attorneys were in a position to acquire information from him of a confidential nature which would have assisted them in cross-examining him about the incident in the present action. Thus, notwithstanding the fact that Dr. Cheatham might previously have testified about certain aspects of the incident without invoking the attorney-client privilege, we hold that the trial court acted properly in allowing him to invoke the privilege with respect to such questioning in the present action.

13. The hospital contends that because the appellees' claim for damages for the decedent's pain and suffering was not properly before the jury (see Division 1, supra), the trial court erred in allowing into evidence certain photographs depicting his condition after the shooting.

" 'The admission or exclusion of photographic exhibits is a matter within the discretion of the trial court, and unless abuse of discretion appears, no error is shown. *DeKalb County v. McFarland*, 231 Ga. 649 (2h) (203 SE2d 495) [1974].' *Thornton v. Thornton*, 232 Ga. 666, 667 (1) (208 SE2d 557) (1974). 'Photographs are ordinarily admissible unless they contain inflammatory depictions which might be prejudicial toward the objecting party. . . .' *Glaze v. Bailey*, 130 Ga. App. 189, 191 (4) (202 SE2d 708) (1973) and cit." *Worrell v. Worrell*, 242 Ga. 44, 47 (247 SE2d 847) (1978). See also *Cagle Poultry &c. Co. v. Busick*, 110 Ga. App. 551, 552-553 (139 SE2d 461) (1964).

The photographs at issue obviously had some relevance to the wrongful death aspect of the case in that they showed how the dece-

dent had died. Although they might be characterized as somewhat gruesome, we find nothing about them which, under the circumstances of this case, could reasonably be characterized as prejudicial or inflammatory. Accordingly, we find this enumeration of error to be without merit.

14. The hospital's final enumeration of error is directed to the overruling of its objections to several of the trial court's jury instructions, as well as the court's failure to give several of its requested charges. In all, 13 separate charges and requests to charge are addressed by this enumeration of error; however, the supporting argument provided by the appellant consists in its entirety of the following statement: "The reasons for these objections are stated clearly on T-1630 through 1636 which are, due to space limitations, incorporated herein by reference."

We find this statement insufficient to qualify as "argument" within the contemplation of Court of Appeals Rule 15 (c) (2). Although the appellant has sought to expand on it in various supplemental briefs filed with this court, it is well settled that "a supplemental brief does not resurrect from abandonment enumerations not addressed in the initial brief. (Cits.)" *McKinney v. South Boston Savings Bank*, 156 Ga. App. 114, 116 (274 SE2d 34) (1980). This enumeration of error is therefore deemed abandoned pursuant to Court of Appeals Rule 15 (c) (2).

15. The appellant has filed a total of nine separate briefs in support of this appeal, totaling over 116 pages. (The seventh was entitled, "Closing Brief," but, alas, failed to live up to its billing in this regard.) The appellees have moved this court to assess damages against the appellant for filing a frivolous appeal, complaining that they have been "compelled to incur exorbitant fees and expenses to respond to these briefs." While we agree with the appellees that much of the argument advanced by the appellant in its prolific outpouring of briefs has been redundant, and while we are sympathetic to their desire to discourage this type of advocacy, we are obviously in no position to declare the present appeal frivolous, inasmuch as it has resulted in a reversal of the judgment below. The appellees' motion must, therefore, be denied.

*Judgment reversed. Cooper, J., concurs. Birdsong, P. J., concurs specially.*

BIRDSONG, Presiding Judge, concurring specially.

I concur with the majority opinion, except that the issues addressed in Divisions 11 and 12 thereof require further explanation in view of a potential for error upon retrial.

As to Division 11: Admission of evidence rests largely within the sound discretion of the trial court. *Gene Thompson Lumber Co. v.*

*Davis Parmer Lumber Co.*, 189 Ga. App. 573.(2) (377 SE2d 15). Appellant currently has failed to show an abuse of discretion by the trial court in excluding the pathologist's opinion as to whether he would have expected Dalmane to be present in the decedent's blood if it had been administered to him about an hour before he went "berserk," and whether he would have expected "it to turn up" during the drug screening test.

As a general rule, however, even if evidence is of doubtful relevancy or competency, it should be admitted and its weight left to the jury. Id. Thus, " '[u]nless the potential for prejudice in the admission of evidence substantially outweighs its probative value the Georgia rule favors the admission of any relevant evidence, no matter how slight its probative value. Evidence of doubtful relevancy or competency should be admitted and its weight left to the jurors. Where evidence is offered and objected to, if it is competent for any purpose, it is not erroneous to admit it.' " *Norman v. State*, 197 Ga. App. 333, 336 (4) (398 SE2d 395), citing *West v. Nodvin*, 196 Ga. App. 825, 828 (3) (397 SE2d 567). I believe the answer to the above question, whether affirmative or negative, would not have been misleading, and the question would be relevant. Further, merely because deceased was not tested for Dalmane would not render an answer that Dalmane should have been present and detectible in his blood, at the time of testing irrelevant; such fact goes merely to weight, not admissibility. Thus, if a retrial occurs and the expert *duly qualified*, it again would lie in the trial court's sound discretion whether to admit this evidence, and error would not be committed by allowing its introduction if such is deemed fundamentally fair in the search for truth.

As to Division 12: Although a party is entitled to a thorough and sifting cross-examination, the scope of such examination is within the sound discretion of the trial court. *Thomas v. Clark*, 188 Ga. App. 606, 608 (4) (373 SE2d 668). The record before us shows no abuse of discretion on the part of the trial court in excluding information presumptively obtained by reason of the attorney-client privilege. However, I believe that unlike any evidence that Dr. Cheatham was once sued for malpractice evidence regarding his prior failure to order physical restraints for one of his former patients who had committed suicide after being admitted to a psychiatric hospital would have some relevance. See Division 1, above. Thus, if on a retrial it could be shown that the evidence was not obtained by means of the attorney-client privilege, or if similar evidence was obtained through an entirely independent source and not due to attorney-client information, it would then lie in the sound discretion of the trial court whether to allow cross-examination into this delicate area bearing in mind that "[t]he object of all legal investigation is the discovery of truth." See generally OCGA § 24-1-2. With these express reservations, I concur

fully with the majority and with the reversal of the judgment.

DECIDED FEBRUARY 28, 1991.

*Swift, Currie, McGhee & Hiers, James B. Hiers, Jr.,* for appellant.

*Howard, Secret & Howard, James W. Howard,* for appellees.