### A07A1964. BRUSCATO et al.
### v. GWINNETT-ROCKDALE-NEWTON COMMUNITY
### SERVICE BOARD et al.
(660 SE2d 440)

BERNES, Judge.

Victor Bruscato attacked and killed his mother. In this wrongful death action, appellant Vito J. Bruscato, Victor's father, seeks damages for the wrongful death of Mrs. Bruscato from appellee, Derek Johnson O'Brien, M.D., the psychiatrist who was treating Victor at the time of the attack. Bruscato alleges that Dr. O'Brien breached duties to protect Mrs. Bruscato from harm and to warn her of Victor's potential dangerousness after he altered Victor's medication regimen.[1] Bruscato further claims that as a result of Dr. O'Brien's breach of his duties, Mrs. Bruscato was stabbed to death by Victor, who was then psychotic. Bruscato appeals the trial court's grant of summary judgment in favor of Dr. O'Brien. For the reasons that follow, we affirm.

The standards applicable to motions for summary judgment are announced in *Lau's Corp. v. Haskins*, 261 Ga. 491 (405 SE2d 474) (1991). When ruling on a motion for summary judgment, the opposing party should be given the benefit of all reasonable doubt, and the court should construe the evidence and all inferences and conclusions therefrom most favorably toward the party opposing the motion. Further, this court conducts a de novo review of the law and the evidence.

---

[1] Bruscato filed the lawsuit, individually and as the surviving spouse of Lillian Lyn Bruscato (the deceased mother), in his capacity as executor of the estate of Lillian Lyn Bruscato, and in his capacity as guardian of the person and property of Victor J. Bruscato. The complaint essentially alleges claims of professional negligence, simple negligence, wrongful death, and breach of contract against Dr. O'Brien, Gwinnett-Rockdale-Newton Community Service Board ("GRN"), and Northside Psychiatric Center, Inc. Dr. O'Brien was employed by Northside Psychiatric Center, Inc., a contract service provider for GRN. The trial court granted summary judgment in favor of GRN and Northside on all claims. The medical malpractice claims brought on behalf of Victor remain pending for jury determination. In this appeal, Bruscato challenges only the grant of summary judgment to Dr. O'Brien on claims arising out of the injury and death of the mother, Lillian Lyn Bruscato.

(Citations omitted.) *Shortnacy v. North Atlanta Internal Medicine*, 252 Ga. App. 321, 321-322 (556 SE2d 209) (2001).

So viewed, the evidence shows that Victor Bruscato was a 40-year-old mental patient who had been diagnosed with severe mental illness, including mild mental retardation, schizophrenia, schizo-affective disorder, intermittent explosive disorder, pedophilia, and psychosis not otherwise specified. Throughout his life, Victor received psychiatric treatment, including inpatient care at several hospitals and at a group home operated by GRN. Victor had a history of aggressive and violent behavior and had been placed on a variety of medications in efforts to control his behavior.

In 1999, GRN removed Victor from the GRN group home and informed the Bruscatos that it would find a place for Victor at an inpatient facility. The Bruscatos, however, wanted Victor to live with them, and, at the request of Victor's mother, GRN agreed to provide outpatient treatment to Victor while he resided with them. The outpatient treatment was conditioned upon the Bruscatos' promise to provide Victor with 24-hour supervision. Victor's mother, Mrs. Bruscato, thereafter became Victor's primary caretaker as GRN continued to provide outpatient services, including psychiatric therapy sessions at its facility and in-home visits by a nurse and community support personnel.

In January 2001, Dr. O'Brien became Victor's treating psychiatrist. Dr. O'Brien prescribed a medication regimen for Victor which included anti-psychotic and mood stabilizing drugs. In the spring of 2002, Mrs. Bruscato contacted the GRN facility expressing concerns that Victor's medications were causing negative side effects, including an elevation of his blood pressure. As a result of her concerns, Mrs. Bruscato requested that Victor be removed from his medications.[2] Dr. O'Brien subsequently altered Victor's medication regimen so that eventually Victor was prescribed only one medication. Although Mrs. Bruscato also requested that Victor be removed from this medication, Dr. O'Brien refused.

For several months following the removal of the medications, Victor and his mother both reported to Dr. O'Brien that Victor was doing well. Mrs. Bruscato told Dr. O'Brien that Victor's impulsivity and sexual urges had decreased and that he was not exhibiting any increased agitation. On July 22, 2002, the last time Dr. O'Brien saw Victor before the attack, Dr. O'Brien observed that Victor exhibited a

---

[2] Mrs. Bruscato told her pastor, church members and friends that she wanted Victor to be taken off all medication.

"somewhat expansive affect" and "rapid thought and speech."[3] During the session, Victor told Dr. O'Brien that he had feelings of anger toward women, but denied that these feelings were "a problem." Dr. O'Brien noted that his denials were "superficial." Mrs. Bruscato nevertheless reported that Victor was "doing well and that he [had] not exhibited impulsive or inappropriate behavior."

Contrary to the reports given to Dr. O'Brien, the Bruscatos were experiencing great difficulty in handling Victor. Victor had become more agitated, argumentative, and "difficult [for his mother] to deal with" at home. Victor told his mother that he was having bad dreams and hearing voices. On one occasion approximately six weeks before the attack, Victor screamed that "[t]he demons won't shut up. They're telling me to kill. They're telling me to murder."

On August 14, 2002, Mrs. Bruscato and a friend witnessed an episode during which Victor stated voices in his head were telling him to do "bad things." Later that same day, a nurse visited the Bruscato home, but Mrs. Bruscato did not report to the nurse that Victor claimed to be hearing voices. Mrs. Bruscato told the nurse that Victor was doing so well that she intended to ask Dr. O'Brien to continue withholding the medications at the next therapy session. Victor, however, told the nurse he was having violent dreams and fantasies.

The next day, Victor attacked and killed his mother by hitting her over the head with a battery charger and stabbing her multiple times. This lawsuit followed.

1. Bruscato contends that the trial court erred in concluding that Dr. O'Brien had no duty to protect Mrs. Bruscato from harm. We disagree.

> [A] doctor, like any actor, generally has no duty to exercise control over third persons to prevent them from harming others. A narrow exception exists to this rule in situations where a physician has control over a patient who is known to be violent and causes harm to others.

(Citations omitted.) *Gilhuly v. Dockery*, 273 Ga. App. 418, 419 (615 SE2d 237) (2005). See Restatement, Torts 2d, § 315 (a). The only other exception to the general rule requires a special relationship between the doctor and the injured party which would confer a right to protection to the injured party. *Gilhuly*, 273 Ga. App. at 419. See Restatement, Torts 2d, § 315 (b).

---

[3] Dr. O'Brien testified that Victor's affect and rapid thought and speech were not unusual for Victor.

In *Bradley Center v. Wessner*, 161 Ga. App. 576, 580-581 (1) (287 SE2d 716) (1982), aff'd, 250 Ga. 199, 200 (296 SE2d 693) (1982), this Court set forth a two-part test for determining whether the first narrow exception applies: (1) the physician must have control over the mental patient; and (2) the physician must have known or reasonably should have known that the patient was likely to cause bodily harm to others. Id.; Restatement, Torts 2d, § 315 (a). See *Keppler v. Brunson*, 205 Ga. App. 32 (421 SE2d 306) (1992); *Ermutlu v. McCorkle*, 203 Ga. App. 335, 336 (1) (416 SE2d 792) (1992).[4]

Bruscato contends that this case is not governed by the test set forth in *Bradley Center* because a "special relation" existed between Dr. O'Brien and Mrs. Bruscato which gave Mrs. Bruscato a right to protection in accordance with Restatement, Torts 2d, § 315 (b).[5] See *Gilhuly*, 273 Ga. App. at 419. Bruscato acknowledges that Mrs. Bruscato was not a patient of Dr. O'Brien in the traditional sense. Relying upon *Swofford v. Cooper*, 184 Ga. App. 50, 53 (2) (360 SE2d 624) (1987), he nonetheless contends that Mrs. Bruscato was conferred "patient-like" status and had privity with Dr. O'Brien since she "necessarily [and] customarily participated in the consultation and treatment of [Victor]." Bruscato's reliance upon the quoted language from the *Swofford* decision is misplaced.

In *Swofford*, this Court was called upon to review the issue of whether the caretakers for a patient became the doctor's patients by virtue of their receiving advice as to the best way to assist with the patient's care. *Swofford*, 184 Ga. App. at 53 (2). The Court concluded that receiving such advice did not make the caretakers "patients." Id. The Court noted that the parents were not "necessar[y] [and] customar[y] [participants]" in the treatment and cited to *Sims v. State*, 251 Ga. 877, 881 (5) (311 SE2d 161) (1984). In *Sims*, the Supreme Court of Georgia held that when joint therapy sessions are conducted, such as in family or marital counseling, the third-party family member or spouse is deemed a "necessary and customary participant" and as such are patients to whom the psychiatrist/patient privilege applies. Id. But here, as in *Swofford*, no joint therapy sessions were involved.

---

[4] "[F]or th[e] duty to control to arise, the physician must be able to exercise control over the freedom of a mental patient, or claim the legal authority to confine or restrain the patient against his will." (Citation and punctuation omitted.) *Keppler*, 205 Ga. App. at 33. "[A]bsent being appointed the legal guardian of the person, there must be evidence of actual assumption of physical control as well as knowledge of the danger the person poses to others if the control is not reasonably maintained." *Trammel v. Bradberry*, 256 Ga. App. 412, 417 (2) (568 SE2d 715) (2002).

[5] The trial court applied the *Bradley Center* test and concluded that it had not been met as a matter of law. Bruscato does not challenge the trial court's conclusion that the test had not been met, but instead argues that the test was not applicable under the circumstances here.

It is undisputed that Dr. O'Brien provided psychiatric services to Victor only and that Mrs. Bruscato did not receive any medical evaluation, care, or treatment from Dr. O'Brien. As conceded by Bruscato, Mrs. Bruscato was not Dr. O'Brien's patient.[6] *Swofford*, 184 Ga. App. at 53 (2). Her presence as a caretaker during Victor's therapy sessions did not confer upon her a "patient like" status.

Nor do we agree that Mrs. Bruscato had a special relationship with Dr. O'Brien based upon privity giving rise to a duty to aid or protect. Citing to *Purcell v. Breese*, 250 Ga. App. 472, 476 (3) (552 SE2d 865) (2001) and *Ga. Osteopathic Hosp. v. O'Neal*, 198 Ga. App. 770, 773-774 (3) (403 SE2d 235) (1991), Bruscato argues that separate and apart from the *Bradley Center* framework, a duty exists if there is privity between the decedent and the physician or hospital. Bruscato claims that based on *Purcell* and *O'Neal*, the voluntary agreement between Dr. O'Brien and Mrs. Bruscato for the provision of 24-hour supervision of Victor placed them in privity of contract and gave rise to a special relationship creating the duty to protect. The cases relied upon by Bruscato do not support his position that privity can be extended to a third party who was never the patient of the physician or hospital. Both *Purcell* and *O'Neal* were cases where the claims at issue were those brought on behalf of the decedent *patient* against the physician and hospital that had been charged with evaluating and/or treating the patient's mental illness. Hence, neither case extends the malpractice liability of a physician or hospital to a third-party nonpatient.

Bruscato has otherwise failed to point to any other special relationship between Dr. O'Brien and Mrs. Bruscato that would give rise to a duty to aid or protect.[7] "[Bruscato's] attempt to bootstrap [the] medical malpractice claims into further causes of action against [Dr. O'Brien] relating to [Mrs. Bruscato] is ... contrary to Georgia law and public policy. [Dr. O'Brien] had no duty to [Mrs. Bruscato] here, as [she was] not his patient[ ]." *Gilhuly*, 273 Ga. App. at 420.

---

[6] "The physician-patient relationship is a consensual one wherein the patient knowingly seeks the assistance of the physician and the physician knowingly accepts him as a patient." (Citation and punctuation omitted.) *Clanton v. Von Haam*, 177 Ga. App. 694, 696 (1) (340 SE2d 627) (1986).

[7] We further note that the Restatement, Torts 2d, §§ 314A and 320, which describe special relationships that could give rise to the duty to aid or protect, do not support the conclusion that a duty would exist under the circumstances of this case. The special relations provided in these sections extend to common carriers, innkeepers, possessors of land, and individuals who are required by law or who voluntarily take custody of another. Although the Restatement provisions state that the special relationships are not limited to those specifically designated, the comments to those provisions otherwise suggest that special relationships are based upon a duty to control.

We decline to "take a step" as suggested by Bruscato and extend the duties imposed by law based upon the circumstances of this case. Victor lived at home under the supervision of his parents for over three years prior to the attack. Extending a physician's duty of care to third parties beyond the provisions of the *Bradley Center* test mandating that the physician exercise control over the patient could discourage outpatient care to the detriment of the state's express policy of providing the "least restrictive alternative," "least restrictive environment," or "least restrictive appropriate care and treatment" to mental patients. See OCGA § 37-3-161 ("It is the policy of the state that the least restrictive alternative placement be secured for every patient at every stage of his medical treatment and care."). See also OCGA §§ 37-3-1 (10); 37-3-81.1 (a) (2); 37-3-82; 37-3-83 (e); 37-3-90 (c). Moreover, the imposition of liability for an outpatient under these circumstances could discourage physicians from including the relative of any mental health patient — or for that matter, the relative of a minor — in the treatment process out of concern that the physician would be exposed to greater liability.

The general rule that a doctor has no duty to prevent harm to third parties applies without exception in this case. Consequently, the trial court's decision granting summary judgment in favor of Dr. O'Brien was authorized.

2. Bruscato further argues that the trial court erred in concluding that Dr. O'Brien had no duty to warn Mrs. Bruscato of Victor's dangerousness following the withdrawal of the anti-psychotic medications. We discern no error.

As an initial matter, there was no evidence sufficient to rebut Dr. O'Brien's direct testimony that he warned Mrs. Bruscato of potential risks of removing Victor from the medications.[8] Dr. O'Brien testified that he informed Mrs. Bruscato that by withholding the psychiatric medications, "there was an increased risk of [Victor's] agitated behavior returning" and "an increase[d] risk of violence." Bruscato failed to provide any contradictory evidence in support of his claim alleging a failure to warn, and, therefore, summary judgment in favor of Dr. O'Brien was authorized.

Moreover, "[t]here is no duty to warn of the obvious, or of that which the plaintiff already knew or should have known." (Citation and punctuation omitted.) *Jacobs v. Taylor*, 190 Ga. App. 520, 527 (2) (379 SE2d 563) (1989). The uncontroverted evidence established that

---

[8] The warning was not reflected in Dr. O'Brien's records. This circumstantial evidence would authorize, but not demand, an inference that no such warning was given. As such, it had no probative value against Dr. O'Brien's positive and uncontradicted direct testimony to the contrary. See *Copeland v. Houston County Hosp. Auth.*, 215 Ga. App. 207, 208 (450 SE2d 235) (1994).

Mrs. Bruscato already knew of Victor's violent tendencies based upon past incidents occurring before the medications were withdrawn. Furthermore, after the medications were withdrawn, Mrs. Bruscato's knowledge of Victor's behavioral tendencies was superior to that of Dr. O'Brien's. Unlike Dr. O'Brien's limited observations of Victor's behavior during his monthly office visits, Mrs. Bruscato had supervised Victor daily for three years prior to the incident. She had readily observed Victor's behavioral tendencies both before and after the medications were withdrawn. Notwithstanding her observations, she failed to report the truth of Victor's mental state to Dr. O'Brien and the visiting nurse and instead indicated that Victor was "doing well" without the medications. Based upon these circumstances, Dr. O'Brien was not legally required to warn Mrs. Bruscato of the precise danger to which she was already fully aware. See id.

*Judgment affirmed. Blackburn, P. J., and Ruffin, J., concur.*

DECIDED MARCH 27, 2008 — 

*Michael B. Butler, William G. Quinn III*, for appellants.
*Owen, Gleaton, Egan, Jones & Sweeney, Milton B. Satcher III, Melissa Phillips Reading*, for appellees.