KRAVITCH, Circuit Judge,
concurring in part and dissenting in part:
In my view, this case is not primarily about religion or expression or equal protection. Rather, the constitutional deprivation suffered by Shahar[1] is the burdening of her First Amendment right of intimate association. In the public employment context, an employee’s intimate association rights must be balanced against the government’s legitimate concerns with the efficient functioning of its agencies. I therefore disagree with the majority’s holding that strict scrutiny ought to be applied in this case. Nonetheless, utilizing a balancing test, I conclude that Sha-har is entitled to constitutional protection.
I. Intimate Association
A. Shahar’s commitment ceremony and relationship with Greenfield is an intimate association entitled to First Amendment protection.
Intimate associations involve “choices to enter into and maintain certain intimate human relationships.” Roberts v. United States Jaycees, 468 U.S. 609, 617-18, 104 S.Ct. 3244, 3249, 82 L.Ed.2d 462 (1984). Such choices “must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme.” Id. In Roberts, the Supreme Court enumerated several characteristics typical of relationships entitled to constitutional protection as intimate associations: “relative smallness, a high degree of selectivity in decisions to begin and maintain the affiliation, and seclusion from others in critical aspects of the relationship.” Id. at 620, 104 S.Ct. at 3250. Family relationships, which “by their nature, involve deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one’s life,” “exemplify” — but do not exhaust — this category of protected associations. Id.; see also Board of Directors of Rotary Int’l v. Rotary Club, 481 U.S. 537, 545, 107 S.Ct. 1940, 1946, 95 L.Ed.2d 474 (1987) (“[W]e have not held that constitutional protection is restricted to relationships among family members.”); Kenneth L. Karst, “The Freedom of Intimate Association,” 89 Yale L.J. 624, 629-37 (1980) (defining intimate association as “a close and familiar personal relationship with another that is in some significant way comparable to a marriage or family relationship”) (emphasis added). A relationship that fits these descriptions is no less entitled to constitutional protection just because it is between individuals of the same sex.
This court has taken an expansive view of the right of intimate association under the First Amendment, protecting even dating relationships. See Hatcher v. Bd. of Educ. & Orphanage, 809 F.2d 1546, 1558 (11th Cir.1987) (“[Ejven a public employee’s association choices as to whom to date enjoy constitutional protection.”); Wilson v. Taylor, 733 *1229 F.2d 1539, 1544 (11th Cir.1984) (“We conclude that dating is a type of association which must be protected by the first amendment’s freedom of association.”).
I agree with the district court and the majority that the relationship between Sha-har and her partner qualifies as a constitutionally protected intimate association. The ceremony was to solemnize and celebrate a lifelong commitment between the two women, who share not only an emotional bond but, as the majority exhaustively describes, a religious faith.[2] Even if Shahar and Greenfield were not religious, I would still find that their relationship involves the type of personal bond that characterizes a First Amendment intimate association.[3] We protect such associations because “the ‘ability independently to define one’s identity that is central to any concept of liberty’ cannot truly be exercised in a vacuum; we all depend on the ‘emotional enrichment from close ties with others.’ ” Bowers v. Hardwick, 478 U.S. 186, 205, 106 S.Ct. 2841, 2851, 92 L.Ed.2d 140 (1986) (Blackmun, J., dissenting) (quoting Roberts, 468 U.S. at 618, 104 S.Ct. at 3250). Where intimacy and personal identity are so closely intertwined as in the relationship between Shahar and Greenfield, the core values of the intimate association right are at stake.
B. Shahar’s intimate association rights were burdened by Bowers’ withdrawal of her job offer.
A public employee’s freedom of association is burdened by adverse employment action if the protected association was a “substantial” or “motivating” factor in the employer’s decision. Mt. Healthy City School Dist. v. Doyle, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); Hatcher v. Board of Pub. Educ., 809 F.2d 1546, 1558 (11th Cir.1987).[4] Bowers argues that he withdrew Shahar’s offer of employment only because she publicly “held herself out” as to be legally married, not because of the planned commitment ceremony or relationship per se, and therefore that Shahar’s right to associate with her partner was not threatened. I agree with the district court, however, that Shahar’s “conduct (‘holding herself out’ as about to marry another woman) is not sufficiently separate from her intimate association (marrying another woman) to allow a finding that this association was not burdened.” Shahar v. Bowers, 836 F.Supp. 859, 863 (N.D.Ga.1993).
The evidence Bowers presents of Shahar’s “holding herself out” as legally married is less than compelling. As the majority observes, Shahar has never asserted — and in fact has repeatedly disclaimed — any civil or legal status as married. What Shahar did do was plan and participate in a private, religious, out-of-state, commitment ceremony. She did not place an announcement in the newspaper or cast the ceremony as a political or religious rally. Shahar did characterize her marital status as “engaged” and identify Greenfield as her “future spouse” on a Department form, the purpose of which was “to elicit information which might be relevant to whether there would be some sort of conflict in [the Department’s] representation of’ another part of state government.[5] In so do *1230 ing, Shahar provided the relevant information (Greenfield was, in fact, employed by the state) as best she could within the constraints of the standardized form, which in any case was filed unread and would never have been visible to the public. Shahar also chatted about “wedding” preparations with two Department co-workers after encountering them by chance in a restaurant while she and Greenfield were planning the ceremony. Finally, for the purpose of arranging her starting date, she notified a Department administrator that she was “getting married” and changing her last name to “Shahar,” and she discussed the planned timing of her “wedding.”[6] All of these mentions by Sha-har of her planned ceremony were reactive, responding to requests for information.[7]
Given the limited extent of Shahar’s pre-termination publicizing of her commitment ceremony in terms that could be misunderstood as implying a legal relationship, I conclude, as did the district court, that Shahar “pursued her desired association only at the price of her desired employment.” Shahar, 836 F.Supp. at 863.
C. Intimate association claims in the public employment context are subject to a balancing test.
The majority determines that because Sha-har was involved in an intimate association akin to marriage and because the relationship was intertwined with religion, strict scrutiny should be applied. While I agree that heightened scrutiny is appropriate in cases where a public employee’s First Amendment association rights have been burdened, it is also necessary to take into account the legitimate interests of government employers. These competing concerns lead me to a “balancing” analysis similar to both the test described in Pickering v. Board of Educ., 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), and strict scrutiny as it has been applied in public employment eases.
This case must be understood in light of the public employment context in which it arises. “[T]he government as employer indeed has far broader powers than does the government as sovereign.” Waters v. Churchill, — U.S. -, -, 114 S.Ct. 1878, 1886, 128 L.Ed.2d 686 (1994) (plurality opinion). The supplemental power afforded the government over its employees is justified by “the practical realities of government employment,” id. at-, 114 S.Ct. at 1886, and the fact that “the government is employing someone for the very purpose of effectively achieving its goals,” id. at-, 114 S.Ct. at 1888. “The key to First Amendment analysis of government employment decisions ... is this: The government’s interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer.” Id.
Neither the Supreme Court nor the Eleventh Circuit has determined the precise standard to be applied to an employee’s intimate association claim against a government employer. As the majority points out, the court in McCabe v. Sharrett, 12 F.3d 1558 (11th Cir.1994), identified and discussed the three most likely standards of review for this type *1231 of case: strict scrutiny,[8] Pickering,[9] and El-rod-Branti.[10] The issue of which standard to apply in intimate association cases remains unsettled after McCabe, however, for in that case the court determined that the employee’s association rights were not violated under any of the three standards considered. McCabe, 12 F.3d at 1569-74. In reaching this conclusion, the court noted that “[a]ll three of these schemes provide the government employer some opportunity to demonstrate that governmental interests justified the challenged employment action.” Id. at 1569 n. 14.
A survey of intimate association cases (and analogous privacy eases) in the context of public employment reveals that courts, irrespective of the doctrinal test being applied, have consistently balanced the interest of the government employer in the efficient functioning of its office against the employee’s interest in pursuing his or her constitutionally protected freedom.[11]
I conclude that in the context of a public employee’s intimate association claim based on adverse employment action, the heightened scrutiny applied by some courts is no different in practice from the Pickering bal *1232 ancing test applied by others. Both necessitate balancing the employee’s constitutional association rights against the government’s interest in the efficient functioning of its agency. Although Pickering and its direct descendants are free speech cases, their motivating principle — optimizing protection of government employees’ fundamental constitutional rights and the effective provision of public services by government agencies — applies equally to intimate association cases under the First Amendment. Like core First Amendment speech, which the Supreme Court has protected in the Pickering line of cases as a “fundamental right” of which citizens must not be deprived just “by virtue of working for the government,” Connick v. Myers, 461 U.S. 138, 147, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983), the right of intimate association is a fundamental aspect of personal liberty, Roberts, 468 U.S. at 617-21, 104 S.Ct. at 3249-51, 82 L.Ed.2d 462. But it is also true that an employee may disrupt the efficient workings of a government office with First Amendment conduct as well as speech. Balancing is equally appropriate in both contexts.[12]
D. Shahar’s intimate association rights outweigh Bowers’ legitimate interests in this case.
The district court applied the Pickering balancing test to Shahar’s intimate association claims. The court correctly noted that Bowers’
asserted interests embody two over-arching concerns: (1) public credibility, specifically the need to avoid the appearance of endorsing conflicting interpretations of Georgia law, and (2) internal efficiency, specifically the need to employ attorneys who act with discretion, good judgment, and in a manner which does not conflict with the work of other Department attorneys.
Shahar, 836 F.Supp. at 864. Proceeding to find sufficient evidentiary support for Bowers’ articulated concerns, the district court concluded that “the unique circumstances of this case show that [Bowers’] interests in the efficient operation of Department outweigh [Shahar’s] interest in her intimate association with her female partner.” Id. at 865. Absent from the district court’s “balancing” discussion, however, is an explicit juxtaposition of Shahar’s intimate association rights or any discussion of their countervailing weight.
The relationship celebrated through Sha-har’s and Greenfield’s commitment ceremony is close to the core of the constitutional right to intimate association, for it exemplifies the characteristics determined by the Supreme Court to warrant special protection. In Roberts, the Court explained that between the poles of “family” relationships and large business enterprises “lies a broad range of human relationships that may make greater and lesser claims to constitutional protection from particular incursions by the State.” Id at 618-22, 104 S.Ct. at 3250-51. Because Shahar’s commitment ceremony and relationship with Greenfield fall close to the “family” end of this continuum, her intimate association rights weigh heavily on the balance.
On the other hand, Bowers is the chief legal officer of the state of Georgia, with responsibility for “seeing that State agencies uphold the law and [for] upholding the law in *1233 general.”[13] Although Georgia does not have a statute which prohibits same-sex “marriages,” and Shahar violated no law by planning and participating in the commitment ceremony with her partner, the state does not officially recognize such a union and would not authorize the issuance of a marriage license to a same-sex couple.[14]
Bowers does not allege that Shahar’s planned ceremony caused any actual disruption of the functioning of the Georgia Department of Law. Although we must consider a government employer’s “reasonable predictions of disruption,” Waters, — U.S. at -, 114 S.Ct. at 1887, the employer’s assessment of harm should be discounted by the probability of its realization in order to weigh it fairly against an actual burden on an employee’s constitutional rights. Certainly, the mere “subjective apprehension that [the employee’s conduct] might have an adverse impact upon” the government agency will not outweigh such a burden. Williams v. Roberts, 904 F.2d 634, 638 (11th Cir.1990).
Bowers first determined that Shahar’s “holding herself out as ‘married’ to another woman ... indicated a lack of discretion regarding the Department’s public position on the proper application for the [Georgia] sodomy statute and Georgia’s marriage laws.”[15] Shahar’s pre-termination conduct, however, seems unrelated to the Department’s legal positions. Second, Bowers characterized Shahar’s representations about her commitment ceremony as “political conduct demonstrating that she did not believe in and was not going to uphold the laws regarding marriage and sodomy.”[16] But there is no evidence in the record to support such an inference; to the contrary, Shahar has never asserted any legal benefit from her marriage, and her commitment ceremony was far from a political demonstration or an act of civil disobedience. In any case, the Department has a rule against certain political activities, which Shahar had understood to preclude advocacy on behalf of, for instance, gay rights.[17] Third, Bowers makes the general assertion that Shahar’s presence in the Department would have a “disruptive” effect on her co-workers.[18] Again, there is no evidence in support of this prediction in the record, and some evidence against: Shahar’s summer clerkship with the Department appears to have been a success.
Bowers further contends that he was motivated to withdraw Shahar’s job offer by the concern that the Department would be perceived by the public as disregarding Georgia law as it pertains to homosexual marriages (which are not recognized) and sodomy (which is illegal).[19] Again, Shahar’s commitment ceremony and relationship were not, before the inception of this case, thrust into the public domain. Even if members of the public were to become aware of and misunderstand the asserted status of the relationship between Shahar and her partner, it is questionable whether they would infer that the Department, by employing Shahar, was acquiescing in the legally legitimate status of the union. Shahar neither violated Georgia’s laws pertaining to marriage nor attempted to avail herself of any legal rights or privileges reserved for legally married people. And there is no evidence that Shahar violated Georgia’s sodomy law.[20] Catering to private *1234 prejudice is not a legitimate government interest. See City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 448, 105 S.Ct. 3249, 3259, 87 L.Ed.2d 313 (1985) (“mere negative attitudes, or fear, unsubstantiated by factors which are properly cognizable [by the government], are not permissible bases” for decisionmaking); Palmore v. Sidoti, 466 U.S. 429, 433, 104 S.Ct. 1879, 1882, 80 L.Ed.2d 421 (1984) (“Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect”).
Although the unique status of Bowers’ office makes this a close ease, I conclude that Shahar’s constitutional interest in pursuing her intimate association outweighs any threat to the efficient operation of the Georgia Department of Law. As the ultimate balancing under Pickering is a question of law for this court to decide de novo, Kurtz v. Vickrey, 855 F.2d 723, 732 (11th Cir.1988), I would reverse summary judgment in favor of Bowers and grant summary judgment in favor of Shahar on her intimate association claim.
II. Expressive Association
“Expressive” association claims involve the “right to associate for the purpose of engaging in those activities protected by the First Amendment — speech, assembly, petition for the redress of grievances, and the exercise of religion.” Roberts, 468 U.S. at 618, 104 S.Ct. at 3249. The right of expressive association protects communal pursuit of the rights expressly protected by the First Amendment. Id. at 618, 622, 104 S.Ct. at 3249, 3252; McCabe v. Sharrett, 12 F.3d 1558, 1563 (11th Cir.1994). In this case, Shahar’s commitment ceremony constituted an association for the purpose of, at least in part, engaging in the exercise of religion, a protected First Amendment activity.[21] I agree with the majority that Bowers’ withdrawal of Shahar’s job offer burdened her right of expressive association.
This court has stated that the Pickering balancing test is the correct standard of review when a public employer burdens an employee’s First Amendment right of expressive association. Hatcher v. Board of Public Educ. & Orphanage, 809 F.2d 1546, 1559 & n. 26 (11th Cir.1987). The majority now determines that Board of Directors of Rotary Int’l v. Rotary Club, 481 U.S. 537, 549, 107 S.Ct. 1940, 1948, 95 L.Ed.2d 474 (1987), overruled Hatcher on this point because the Supreme Court in Rotary applied a compelling interest test to the plaintiffs expressive association claim. Rotary, however, was not an employment case, and, as explained above, in the employment context the state has “far broader powers than does the government as sovereign.” Waters, — U.S. at - , 114 S.Ct. at 1886. Because I believe that this court continues to be bound by Hatcher, Pickering, not strict scrutiny, should be applied in reviewing Shahar’s expressive association claim.[22]
“The intrinsic and instrumental features” of expressive and intimate association “may, of course, coincide.” Roberts, 468 U.S. at 618, 104 S.Ct. at 3249. In this case, as the *1235 district court found, Shahar’s expressive association claim overlaps not just her intimate association claim but also her free exercise claim. I agree with the district court that Shahar’s expressive association claim “offers no greater claim to constitutional protection than [her] intimate association claim,” Shahar, 836 F.Supp. at 862, given that Pickering should be applied to both, and therefore I would not address it any further.
III. Free Exercise of Religion
I would not remand for reconsideration on the free exercise claim. Rather, because in my view this case is not about the free exercise of religion, and because the violation of Shahar’s intimate association rights is dis-positive, I would not reach this issue.
IV. Equal Protection
Shahar’s equal protection claim is based on the contention that Bowers withdrew her job offer, at least in part, because she is a homosexual. Shahar argues that classifications based on sexual orientation should be subject to strict scrutiny under the Equal Protection Clause.[23]
The facts of this case, however, do not support Shahar’s contention that Bowers withdrew her offer because of her sexual orientation.[24] Bowers asserted that he withdrew Shahar’s job offer only because of conduct surrounding her commitment ceremony and relationship with her partner, not be-eause of her status as a homosexual. The record establishes that the Department has neither a policy nor a proven practice of excluding homosexuals from employment, and that Bowers generally does not inquire into the sexual practices or preferences of applicants and employees. Furthermore, a number of Department employees, including at least two in management positions (but not, apparently, Bowers himself), were aware that Shahar was a lesbian when the offer of employment was extended. Although Sha-har offers some indirect evidence of divergent attitudes in the Department towards homosexuals and heterosexuals, she has not shown that she was treated differently, for equal protection purposes, on the basis of sexual orientation.[25] Her equal protection claim thus fails.
Accordingly, I CONCUR in part and DISSENT in part.

. The plaintiff-appellant and her partner legally changed their surnames from "Brown” and “Greenfield,” respectively, to "Shahar,” which they understood to mean in Biblical Hebrew “[t]he act of seeking God.” Shahar Dep. at 23. For the sake of clarity, I will refer to the plaintiff-appellant as "Shahar” and to her partner as "Greenfield."

. Shahar has described Greenfield as her “life partner,” elaborating, "Fran is my best friend and she is my main confidante, and there is just a certain closeness with her that I don’t share with others." Shahar Dep. at 5-6.

. To avoid confusion, my view is that relationships possessing the characteristics cataloged above — "smallness,” "selectivity," "seclusion,” “deep attachment[] and commitment[],” etc.— warrant constitutional protection irrespective of (not because of) the sexual orientation of the individuals involved.

. Under Mt. Healthy causation analysis, even if the employee proves that the conduct at issue is constitutionally protected and was a "substantial factor” in the government’s decision to take adverse employment action, the government employer will still prevail if it can show by a preponderance of the evidence that it would have reached the same decision even in the absence of the employee’s protected conduct. Mt. Healthy, 429 U.S. at 285-87, 97 S.Ct. at 575-76. Nothing in the record of this case, however, indicates that Bowers would have withdrawn Shahar’s employment offer if she had not planned to participate in the commitment ceremony.

.Bowers Dep. at 33-34.

. Shahar Dep. at 77.

. Shahar's occasional use of the words "marriage" and "wedding” to describe the ceremony she and Greenfield were preparing to undertake hardly amounts to flaunting Georgia law. Neither "marriage” nor "wedding" is a proprietary legal term. Rabbi Friedlander testified that "marriage" is the appropriate English translation of the Hebrew term for the Jewish wedding rituals followed by Shahar and Greenfield. Friedlander Dep. at 48-50. And one of the English meanings of "marriage” is simply "an intimate or close union.” Webster’s Third New Int’l Dictionary (1961).
Shahar might have been better served had she been consistent in referring to Greenfield as her "partner,” and the event at issue as a “commitment ceremony." On the other hand, in response to a deposition question about her use of the word "engaged” to describe her relationship with Shahar, Greenfield replied:
We are limited by language. It is sort of derived for heterosexuals. We use the language because we don’t have a better one to explain what we are talking about, but it describes that there is a sense of a commitment relationship, there is a union to take place, this person is part of my family....
Greenfield Dep. at 28.

. Under strict scrutiny, the government must show that its action is “narrowly tailored to serve a compelling government interest." McCabe, 12 F.3d at 1566.

. See Pickering v. Board of Educ., 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). The Pickering analysis was developed in the context of an adverse employment action on the basis of a public employee’s speech. Under Pickering, courts balance "the interests of the [employee], as a citizen, in commenting on matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.” McCabe, 12 F.3d at 1564 (quoting Pickering, 391 U.S. at 568, 88 S.Ct. at 1734).

. See Elrod v. Burns, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); Brand v. Finkel, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980). Under the Elrod-Branti analysis, which was developed in the context of an adverse employment action based upon a public employee’s political affiliation, courts "look to whether party affiliation is important to effective performance of the job at issue.” McCabe, 12 F.3d at 1565.
Because the Elrod-Branti analysis has been limited to the context of political patronage, I will exclude it from further consideration in the intimate association context.

. See Whisenhunt v. Spradlin, 464 U.S. 965, 970-72, 104 S.Ct. 404, 408-09, 78 L.Ed.2d 345 (1983) (Brennan, J„ joined by Marshall and Blackmun, JJ., dissenting from denial of cert.) (calling for heightened scrutiny for employees’ due process privacy claims, but recognizing that "[p]ublic employers ... deserve considerable latitude in enforcing codes of conduct”); Kelley v. Johnson, 425 U.S. 238, 244-49, 96 S.Ct. 1440, 1444-46, 47 L.Ed.2d 708 (1976) (balancing police officer's liberty interest in personal appearance against police department’s need to regulate the hair length of its officers, after suggesting that state employees may be subject to more restrictive regulations where their less fundamental rights are at stake); Stough v. Crenshaw County Bd. of Educ., 744 F.2d 1479 (11th Cir. 1984) (applying Pickering balancing test to school board employee’s constitutional challenge to policy prohibiting school board employees from sending their children to private schools); Wilson v. Taylor, 733 F.2d 1539, 1542-44 (11th Cir.1984) (assuming that Pickering is the appropriate standard for police officer's intimate association claim); Dike v. School Bd., 650 F.2d 783, 787 (5th Cir. Unit B 1981) (nominally applying strict scrutiny to school board’s burden on employee’s liberty interest in breast-feeding her child, but remanding for consideration of whether school board’s interests in avoiding disruption of educational process, ensuring that teachers perform their duties without distraction, and avoiding potential liability for accidents were strong enough to justify the burden); Fyfe v. Curlee, 902 F.2d 401 (5th Cir.1990) (applying Pickering balancing to public school employee’s First Amendment privacy claim arising out of termination due to decision to send her daughter to private school); Thorne v. City of El Segundo, 726 F.2d 459, 468-72 (9th Cir.1983) (applying sliding-scale scrutiny, so that ”[t]he more fundamental the rights on which the state's activities encroach, the more weighty must be the state’s interest in pursuing that course of conduct,” to employee’s privacy and intimate association claims); Kukla v. Village of Antioch, 647 F.Supp. 799, 803-12, 806 (N.D.Ill.1986) (analyzing employee's intimate association claim by "weighing the amount of constitutional protection given to the conduct in question against the extent to which restriction of it is necessary for the government agency to function”); Briggs v. North Muskegon Police Dept., 563 F.Supp. 585 (W.D.Mich.1983) (balancing police officer’s intimate association and privacy rights against police department’s interest in officer's job performance), aff'd without opinion, 746 F.2d 1475 (6th Cir.1984), cert. denied, 473 U.S. 909, 105 S.Ct. 3535, 87 L.Ed.2d 659 (1985); Childers v. Dallas Police Dept., 513 F.Supp. 134, 139-42 (N.D.Tex.1981) (applying Pickering balancing test to city employee’s First Amendment association claim), aff'd without opinion, 669 F.2d 732 (5th Cir.1982).

. One aspect of how Pickering free speech analysis maps onto intimate association cases might be misleading. In Connick, the Supreme Court made clear that a government employee can be protected under Pickering only if the speech in question relates to "matters of public concern.” 461 U.S. at 147, 103 S.Ct. at 1690. Obviously, it would be paradoxical to require a government employee’s intimate association to relate to a matter of public concern as a threshold requirement for constitutional protection. The point of the Connick requirement, however, is simply to operationalize Pickering's purpose of upholding only the more fundamental rights of public employees and not turning federal courts into general review boards for personnel decisions. Id. Speech on matters of public concern is given categorical protection under Pickering and Con-nick because this type of speech "occupies ‘the highest rung of the hierarchy of First Amendment values.’” Id. at 145, 103 S.Ct. at 1689 (quoting Carey v. Brown, 447 U.S. 455, 467, 100 S.Ct. 2286, 2293, 65 L.Ed.2d 263 (1980)).
Therefore, inasmuch as Connick may be instructive in the intimate association context, it reaffirms the appropriateness of the sliding-scale scrutiny inherent in a balancing test that weighs intimate associations closer to the core of the First Amendment right more heavily than those closer to the periphery.

. Bowers Dep. at 42.

. Nor does Georgia recognize same-sex common-law marriages. See O.C.G.A. § 19-3-1; Georgia Osteopathic Hosp., Inc. v. O'Neal, 198 Ga.App. 770, 403 S.E.2d 235, 243 (1991) ("In order for a common-law marriage to come into existence, the parties must be able to contract, must agree to live together as man and wife, and must consummate the agreement.”).

. Br. of Appellee at 12-13.

. Br. of Appellee at 13; Bowers Dep. at 62-63.

. Br. of Appellee at 5; Shahar Dep. at 60-61.

. Br. of Appellee at 13; Bowers Dep. at 90-91.

. The Georgia consensual sodomy statute, O.C.G.A. § 16-6-2, which makes oral and anal sex illegal, applies equally to homosexuals and heterosexuals.

. Bowers admits that he has no knowledge of Shahar’s actual sexual behavior. Bowers Dep. at 69. Instead, in considering whether to withdraw Shahar’s job offer, he claims to have relied on "the public perception that ‘the natural consequence of a marriage is some sort of sexual conduct' ... and if it’s homosexual, it would have to be sodomy.” Brief of Appellee at 10-11; Bowers Dep. at 80-81. The bare description of a *1234 person as "homosexual," however, is hardly sufficient to support an inference that he or she has engaged in the specific conduct violative of Georgia’s sodomy law. Cf. Able v. United States, 880 F.Supp. 968, 976 (E.D.N.Y.1995) ("This court concludes that under the First Amendment a mere statement of homosexual orientation is not sufficient proof of intent to commit acts as to justify the initiation of discharge proceedings.”).

. On the facts of this case, I do not believe that Shahar has stated a viable expressive association claim based on social or political aspects of her commitment ceremony and relationship with her partner. In any case, an association claim based on public expression would be in tension with Shahar’s more compelling intimate association claim.

. Connick’s public concern requirement does not stand in the way of Shahar’s expressive association claim in this circuit. See Hatcher, 809 F.2d at 1558 ("We conclude, however, that Con-nick is inapplicable to freedom of [expressive] association claims.”). Other circuits have applied the Connick requirement to expressive association claims. See Griffin v. Thomas, 929 F.2d 1210, 1212-14 (7th Cir.1991); Boals v. Gray, 775 F.2d 686, 691-93 (6th Cir.1985); see also Clark v. Yosemite Community College Dist., 785 F.2d 781, 791 (9th Cir.1986) (noting that because defendant had not raised the question, the court had no need to decide whether the plaintiff's "right of association with the union touches on a matter of public concern so as to give rise to a cause of action in federal court for a violation of First Amendment rights”).

.Judge Godbold would hold that strict scrutiny applies to Shahar's equal protection claim because Shahar's fundamental right of free exercise of religion has been burdened. This equal protection analysis is both flawed and superfluous. Shahar does not argue, and the record does not indicate, that she was treated differently because of her religion. See, e.g., Elston v. Talladega County Bd. of Educ., 997 F.2d 1394, 1406 (11th Cir.1993) ("To establish an equal protection clause violation, a plaintiff must demonstrate that a challenged action was motivated by an intent to discriminate.”) (citing Village of Arlington Heights v. Metropolitan Hous. Dev. Corp., 429 U.S. 252, 265, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977); Washington v. Davis, 426 U.S. 229, 238-48, 96 S.Ct. 2040, 2047-52, 48 L.Ed.2d 597 (1976)). Nor did Bowers classify employees in the manner contemplated by equal protection principles. See, e.g., Nordlinger v. Hahn, 505 U.S. 1, 10, 112 S.Ct. 2326, 2331, 120 L.Ed.2d 1 (1992) (stating the general equal protection principle that rational basis review applies "unless a classification warrants some form of heightened review because it jeopardizes exercise of a fundamental right or categorizes on the basis of an inherently suspect characteristic”) (emphasis added). Moreover, even if Shahar could make out an equal protection claim based on her fundamental right of free exercise, this claim would be subsumed by her direct free exercise claim; no greater constitutional protection would result.

. Shahar further argues that disputed issues of material fact should have precluded summary judgment. After reviewing the record, however, I agree with the district court that the pertinent facts are undisputed.

. Thus, we need not reach the issue of whether homosexuals constitute a suspect class entitled to strict scrutiny for equal protection claims.