38270. MISFELDT *v.* HOSPITAL AUTHORITY OF THE CITY OF MARIETTA.

DECIDED APRIL 14, 1960—REHEARING DENIED MAY 3, 1960.

*Holcomb & Grubbs, J. M. Grubbs,* for plaintiff in error.
*Scott S. Edwards, Fred E. Bartlett,* contra.

TOWNSEND, Judge. The sole issue for decision by this court is whether the trial court erred in refusing to allow the case to go to a jury. In reaching a conclusion, the evidence together with all reasonable deductions and inferences from it must be construed in favor of the party against whom the verdict is directed. *Whitaker v. Paden,* 78 *Ga. App.* 145 (50 S. E. 2d 774). Should the evidence be subject to more than one construction on a material issue, the case is for the jury. *Whitlock v. Michael,* 208 *Ga.* 229 (65 S. E. 2d 797); *Northwestern University v. Crisp,* 211 *Ga.* 636, 647 (88 S. E. 2d 26). So construed, the following evidence in favor of the plaintiff must be taken into consideration: The physician admitting the patient had made a provisional diagnosis of paranoid schizophrenia. He did not inform the hospital authorities directly of this diagnosis, but he did inform the admissions clerk by telephone when he first called to arrange for a room that the patient was mentally disturbed and that he would like to have her admitted to the "psycho room." There were three such rooms in the hospital especially prepared for patients suffering from mental disturbance. One of them was vacant at the time of the call. The admissions clerk relayed the message to the supervisor of admissions, including the statement that the patient was mentally disturbed. The supervisor of admissions had just learned that a former nurse wanted to bring her child in to have his tonsils removed the next day and wanted to spend the night with him; since the psycho rooms were used as private rooms on occasion she desired to place the little boy there so that his mother could sleep with him and she therefore told the admissions clerk that there was no psycho room available. The admissions clerk then informed the doctor, who next requested a private room. The admissions clerk again consulted the supervisor of admissions and was told there was no private room, although the psycho room was still vacant. On being informed, the physician said that under the circumstances she would have to be admitted to the four-bed ward. A psychiatrist testified that one of the indications of mental disturbance is a glazed appearance of the eyes. A number of persons who saw the patient shortly before admission, and the plaintiff who stayed with her for about an hour after admission, testified to her

strange appearance and especially the glazed appearance of her eyes. The employee who conducted the patient up the elevator to the bed assigned to her noticed that she seemed excitable and either frightened or highly nervous, and that "she had a kind of glary look in her eyes." The attendant stayed with the patient until the nurse arrived because of the fact that she seemed so highly nervous and felt she should not be left alone, and she then commented on the patient's appearance to the nurse who arrived. The supervisor of nurses admitted that under hospital rules she was aware that someone should be with mentally disturbed patients at all times, and also stated she probably should have contacted the director of nurses but instead waited for the director of nurses to contact her. The admissions clerk further testified that she called to the attention of the supervisor of admissions the fact that the psycho room was empty while the physician was on the telephone, but was very sharply told that she, the supervisor, would take care of the matter.

The physician had prescribed three sedatives marked "Q.I.D.," meaning they were to be administered (except for the seconol) at regular intervals four times a day. One of these intervals occurred about 4 p.m. The patient was given her phenobarbital, but the third drug, a tranquilizer called pacatal, was not kept in the regular store but had to be sent for. The floor nurse testified that she saw the prescription and knew she would have to fill out a pharmacy slip in order to get it but had not gotten around to filling out the slip at the time of the suicide attempt. While she insisted there was nothing abnormal about the patient, and that she had no instructions other than the word "ambulatory" which meant that the patient could walk around the hospital at will, the evidence further shows that on being informed that a patient from her floor had jumped out the window she ran directly to the bed of the plaintiff's wife.

The case, construed in favor of the plaintiff, thus presents us with the tragic results of divided responsibility. The physician in charge felt he had made plain to the hospital authorities that the patient was mentally disturbed, and, being on the hospital staff, he undoubtedly supposed that such a patient would at no time be left to her own devices contrary to hospital regulations.

The admissions clerk felt she had represented the case to the superintendent of admissions if anything too strongly, because she received a rebuke from that source at her specific indication of the "psycho room." The superintendent contended she was not told the patient might become violent, that her appearance was normal, and that she accordingly awaited further instructions from the director of nurses. The director never entered the picture. The floor nurse relied upon any lack of special instructions to herself to guard the patient, and, as to the medicine, she contended that the words on the prescription "Q.I.D." instead of "stat" indicated to her that there was no reason for prompt medication, but only that the medicines, after they were obtained, would be administered in routine fashion.

From the above there can be no doubt but that there was some evidence, at least, to sustain the allegations of negligence. The hospital did have notice of the patient's mentally disturbed condition, and it cannot be said as a matter of law that they were freed from responsibility because this notice was not in writing contained in the specific instructions brought to them by the patient's husband at the physician's request. There was enough evidence as to the patient's appearance on arrival to make a jury issue as to whether trained staff members should not then have recognized her irresponsible condition. They did not, rightly or wrongly, keep constant watch over her, and they did allow her to wander away by herself. The particular tranquilizer on which the physician undoubtedly relied should have been given at the regular 4 p.m. administration of medicine. Whether, had it been sent for in time, it would hve been available for that purpose, and whether the delay in sending for it constituted negligence, were also jury questions.

It is true that one is not bound to foresee and guard against casualties which are not reasonably to be expected, or which would not occur save under exceptional circumstances, or which result from an unexpected act of the person injured. *McCrory Stores Corp.* v. *Ahern*, 65 *Ga. App.* 334, 336 (15 S. E. 2d 797). It is true that if the negligence alleged is solely the result of the conduct of the physician (acting in his individual capacity and not as an agent of the hospital) there can be no recovery. *Black*

v. *Fischer,* 30 *Ga. App.* 109 (117 S. E. 103). If the plaintiff's wife was not mentally ill, and her injuries were done pursuant to her own rational and calculated act, then she would be the cause of her own injuries and her husband could not recover. *Southland Butane Gas Co.* v. *Blackwell,* 211 *Ga.* 665 (88 S. E. 2d 6). But none of these defenses is supported by uncontroverted evidence.

The information conveyed to the hospital attache's by the doctor that the plaintiff's wife was ambulatory under the meaning of that word as disclosed by the medical testimony in the record referred to her physical rather than her mental condition and meant that the patient was able to walk to the bathroom and elsewhere in the hospital that it was necessary for her to go, and that, accordingly, she would not require bed pan service or mechanical assistance in transportation. It would also convey to the hospital attache's who already had notice of her mental disturbance that she, a mentally disturbed person, could get up and walk about the hospital unless prevented by attendants from so doing.

It was accordingly error for the trial court to direct a verdict in favor of the defendant, and thereafter to deny the plaintiff's motion for a new trial.

*Judgment reversed. Gardner, P. J., Carlisle and Frankum, JJ., concur.*