## A10A1230. BRUSCATO v. O'BRIEN.
(705 SE2d 275)

ELLINGTON, Judge.

Vito J. Bruscato, in his capacity as the guardian of Victor Bruscato, appeals from the order of the Superior Court of DeKalb County, which granted summary judgment to Victor Bruscato's psychiatrist, Derek Johnson O'Brien, M.D., in this medical malpractice case.[1] The superior court concluded that Bruscato's malpractice claims were barred either by the application of the "impact rule" or on public policy grounds. For the following reasons, we reverse.

> To prevail at summary judgment under OCGA § 9-11-56, the moving party must demonstrate that there is no genuine issue of material fact and that the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law. On appeal of a

---

[1] Judge Andrews notes in his dissent that "[t]his is the second appearance of this case before us." The case the dissent refers to, however, was a suit brought by Vito Bruscato — who is not the real party plaintiff in interest in this case — against O'Brien and the Gwinnett-Rockdale-Newton Community Service Board, in Gwinnett County, for the wrongful death of Vito's wife. We affirmed the grant of summary judgment in that case for reasons that have no application to the instant suit, which was brought by a different plaintiff arguing an entirely different theory of recovery. See *Bruscato v. Gwinnett-Rockdale-Newton Community Svc. Bd.*, 290 Ga. App. 638 (660 SE2d 440) (2008).

grant of summary judgment, this Court reviews the evidence de novo to determine whether a genuine issue of material fact exists or whether the movant is entitled to judgment as a matter of law.

(Citations omitted.) *Boggs v. Bosley Med. Institute*, 228 Ga. App. 598, 599 (492 SE2d 264) (1997).

So viewed, the record reveals the following. O'Brien began treating Victor Bruscato, a then 38-year-old, mentally ill patient with a history of violence, in January 2001. O'Brien reviewed Bruscato's treatment records, which revealed that Bruscato's mental illness manifested in childhood and that he had been diagnosed over the course of his life with mental retardation, organic mood disorder, pervasive developmental disorder, schizophrenia, a nonspecified psychotic disorder, pedophilia, and intermittent explosive disorder. Bruscato had expressed homicidal thoughts toward his parents, and he had physically assaulted them and others, including a hospital employee and a young girl. He had also experienced auditory hallucinations that commanded him to kill people or to molest girls.

When O'Brien began treating Bruscato, Bruscato had been living with his parents for almost two years. Before that, he had been living in a group home operated by the Gwinnett-Rockdale-Newton Community Service Board ("CSB"), but he had been removed from the home because of the risk that he might sexually assault a girl. Bruscato's expert witness opined that his elderly parents were ill-equipped to manage a severely mentally-ill adult and were "strong-armed" into taking him home. While at home, Bruscato continued receiving outpatient treatment from the CSB. Bruscato's expert witness opined that the medications the CSB staff administered to Bruscato controlled his violent behavior and sexual impulses. O'Brien knew that, because Bruscato was potentially dangerous, the CSB required his parents to monitor him continuously.

In late May 2002, O'Brien ordered that two of Bruscato's medications, Zyprexa and Luvox, be discontinued for six weeks to rule out the possibility that Bruscato might be developing neuroleptic malignancy syndrome ("NMS"). O'Brien's own expert witness opined that, if Bruscato had NMS, which the expert believed he did not, the proper procedure would be to hospitalize him. He also opined that withholding Bruscato's medications for that period to rule out the possibility of NMS, which is very rare, was not medically justified.

According to a family friend, about two-and-a-half weeks after Bruscato stopped taking Zyprexa and Luvox, he began having nightmares, panic attacks, and bouts of heavy sweating. He also started hearing voices telling him to kill, and he became increasingly

hostile toward his parents. On July 22, O'Brien met with Bruscato briefly and noted that he spoke rapidly, seemed excited, and was feeling angry at women. O'Brien, however, did not make any changes to Bruscato's treatment plan. On August 11, Bruscato scrawled a "prayer note," stating: "[I] need prayer big time devil tormenting me." O'Brien opined in his deposition that the letter "could convey psychosis." On August 14, a friend visiting Bruscato's home observed him rocking back and forth on his bed, pleading for the voices in his head to leave him alone. A nurse, who also visited on the same day, noted that Bruscato was argumentative, was expressing thoughts about sexual fantasies and dreams, and was generally irritable.

On August 15, Bruscato crushed his mother's skull with a battery charger and stabbed her 72 times, killing her. When questioned by the arresting officers, Bruscato said that he killed his mother and that he knew it was wrong, but that the devil had told him to do it. After Bruscato was jailed, the assistant director of prison mental health services wrote Bruscato's criminal defense attorney. She advised him that, when Bruscato was arrested, he had been "non-compliant with his anti-psychotic medications," and, during his intake assessment, he had reported auditory hallucinations that were "persecutory in nature," that he had trouble controlling his impulses, and that he had very poor insight into his situation, asking "what member of his family would become his new mother." Bruscato wondered whether his mother could be "brought back to life." After reintroducing Zyprexa into Bruscato's medication regimen, the director noted that he became "compliant" and that his condition "improved steadily." Although Bruscato was indicted for his mother's murder in 2002, he was found to be incompetent to stand trial. As of the date of the trial court's summary judgment order in the instant case, Bruscato has been residing at Central State Hospital, where he had been committed.

Bruscato's expert witness opined that when O'Brien

> abruptly terminated [Bruscato's] Zyprexa, not only was this a violation of the standard of care required of Dr. O'Brien, it resulted in the imposition of chemical changes in [Bruscato's] brain. Those chemical changes in turn produced adverse physical responses in [Bruscato's] brain and ultimately in his body.

The expert stated that Bruscato's mental illness was not merely emotional or behavioral, but neurological — "a medical disorder." The expert further opined that the chemical changes that resulted from withholding medication caused Bruscato to "decompensate"

and experience the return of the most severe symptoms of his medical disorder, including auditory command hallucinations, agitation, and hostility. The expert concluded that O'Brien's treatment "manifested gross negligence and a disregard of the consequences of leaving a historically violent and potentially psychotic patient unmedicated," which ultimately led to Bruscato's killing his mother while in a psychotic state.

1. Bruscato contends the trial court erred when it granted O'Brien's motion for summary judgment based upon a finding that he "failed to establish an injury for which the law provides recovery," and entered judgment in favor of O'Brien on all counts of the complaint. Specifically, Bruscato argues that the court erred in characterizing his claim for damages arising prior to the attack on his mother as a claim for "[m]ental distress and anguish" and concluding that, because Bruscato had suffered no physical injury or pecuniary loss prior to the attack, he was barred from recovering for the "negligent infliction of emotional distress" by the so-called "impact rule."[2] We agree.

"Three elements are essential to establish a medical malpractice claim: the doctor's duty to his patient; the doctor's breach of that duty through the failure to exercise the requisite degree of skill and care; and an injury proximately caused by the doctor's failure." (Citations omitted.) *Haughton v. Canning*, 287 Ga. App. 28 (2) (650 SE2d 718) (2007). OCGA § 51-1-27, which pertains to actions for medical malpractice, provides: "A person professing to practice surgery *or the administering of medicine* for compensation must bring to the exercise of his profession a reasonable degree of care and skill. *Any injury* resulting from a want of such care and skill shall be a tort for which a recovery may be had." (Emphasis supplied.) The statute clearly provides that a compensable injury may result from a physician's failure to properly administer medicine, and we have held that whether drugs were administered properly is a medical question involving professional judgment and skill. See *Williams v. Alvista Healthcare Center*, 283 Ga. App. 613, 615-616 (1) (a) (642 SE2d 232) (2007); *Shirley v. Hosp. Auth. of Valdosta/Lowndes County*, 263 Ga. App. 408, 409-410 (1) (587 SE2d 873) (2003).

Bruscato asserts that O'Brien, his psychiatrist, breached his duty of care to him when he misdiagnosed him with possible NMS, negligently altered his medication regimen as a result thereof, and

---

[2] A long succession of cases has explained, clarified, distinguished, and limited the impact rule to prevent a plaintiff from recovering for emotional distress from the negligence of a defendant when the plaintiff did not suffer either physical injury or monetary loss as a result of the negligence. See, e.g., *Lee v. State Farm &c. Ins. Co.*, 272 Ga. 583, 586-588 (II) (533 SE2d 82) (2000).

negligently monitored his physical, mental, and emotional status while he withdrew from the medications. Bruscato avers that, as a result of O'Brien's medical malpractice, he suffered these injuries: he "decompensated" to the point where he experienced auditory command hallucinations telling him to kill, he succumbed "to a state of profound mental confusion . . . to the extent that [he] was deprived of any ability to control his violent impulses," he experienced the "reemergence of his underlying psychosis," and he suffered a psychotic break with reality, during which he killed his mother. Further, in opposition to O'Brien's motion for summary judgment, Bruscato's expert witness opined that, when O'Brien abruptly discontinued Bruscato's medication, Bruscato experienced chemical changes in his brain and, ultimately, his body that affected him physiologically.

Pretermitting whether the injuries that Bruscato alleges he suffered as a result of O'Brien's professional negligence were physical, psychological, or both, we conclude that the question is irrelevant to Bruscato's medical malpractice claim. We conclude that the medical malpractice statute, which provides that "any injury" resulting from the breach of a physician's duty is a compensable injury, is not limited by the application of the "impact rule." In reaching this conclusion, we have considered the underlying purposes of applying the "impact rule" to causes of action for the negligent infliction of emotional distress and conclude that there is no rational basis for applying the rule to causes of action sounding in medical malpractice.

It is beyond dispute that "emotional distress" is a normal, even expected, part of life and can be caused by an almost infinite array of factors or a combination of those factors. Further, a person's perception of his or her "emotional distress" is subjective and difficult to prove or to disprove, as is the causal connection between a defendant's allegedly negligent act or omission and the emotional distress. Thus, the Supreme Court of Georgia has held that, "[i]n a claim concerning negligent conduct, a recovery for emotional distress is allowed only where there is some impact on the plaintiff, and that impact must be a physical injury." (Citation, punctuation and footnote omitted.) *Lee v. State Farm &c. Ins. Co.*, 272 Ga. 583, 584 (I) (533 SE2d 82) (2000).[3] "[T]he current Georgia impact rule has three elements: (1) a physical impact to the plaintiff; (2) the physical impact causes physical injury to the plaintiff; and (3) the physical

---

[3] We do not address that aspect of the impact rule which allows recovery in cases involving the negligent infliction of emotional distress when the plaintiff has suffered a pecuniary loss. For a full discussion of that aspect of the rule, see *Nationwide &c. Ins. Co. v. Lam*, 248 Ga. App. 134, 136 (1) (546 SE2d 283) (2001).

injury to the plaintiff causes the plaintiff's mental suffering or emotional distress." Id. at 586 (I).

> There are three policy reasons traditionally given for having the impact rule and denying recovery for emotional distress unrelated to physical injuries. First, there is the fear[ ] that[,] absent impact, there will be a flood of litigation of claims for emotional distress. Second, [there] is the concern for fraudulent claims. Third, there is the perception that, absent impact, there would be difficulty in proving the causal connection between the defendant's negligent conduct and claimed damages of emotional distress. . . . [T]he benefits of an impact rule are plain in that it provides a *brighter line of liability* and a *clear relationship between the plaintiff's being a victim of the breach of duty* and compensability to the plaintiff.

(Citations omitted; emphasis supplied.) Id. at 587 (II).[4] Consequently, the impact rule is an appropriate measure to be applied in cases involving the negligent infliction of emotional distress to *bystanders or third parties* who are *not physically impacted by the defendant's negligence and whose injuries are not a foreseeable result of such negligence.* See id. at 589 (Hunstein, J., concurring specially) (endorsing a foreseeability rule as preferable to the "regressive" impact rule). Without the impact rule (or some related concept, such as foreseeability) to limit potential claimants and to prevent frivolous lawsuits, a defendant's single act of negligence could result in his or her having to defend against claims by a multitude of bystanders for their alleged emotional distress.

The above-stated policy concerns, however, are not present in medical malpractice cases, because such cases *require* a physician-patient relationship between the defendant and the plaintiff. See OCGA § 51-1-27; *Haughton v. Canning*, 287 Ga. App. at 28 (2). Consequently, there is no question to be resolved regarding the

---

[4] In *Lee*, the Supreme Court ultimately concluded that
the policy concerns behind our traditional impact rule are not extant in this case, and *there is no meritorious reason in an appropriate and compelling situation to refuse to extend recovery for emotional distress* to an incident in which the distress is the result of physical injury negligently inflicted on another. *The circumstance of this case is such an appropriate and compelling situation.* When, as here, a parent and child sustain a direct physical impact and physical injuries through the negligence of another, and the child dies as the result of such negligence, the parent may attempt to recover for serious emotional distress from witnessing the child's suffering and death without regard to whether the emotional trauma arises out of the physical injury to the parent.
(Citations and footnote omitted; emphasis supplied.) Id. at 588 (III).

emotional impact of the defendant's alleged negligence on third parties or bystanders, nor is there concern about a "flood of litigation" arising from such negligence. Further, the concern about avoiding fraudulent or frivolous lawsuits is already addressed by the strict pleading requirements of OCGA § 9-11-9.1. See *Bowen v. Adams*, 203 Ga. App. 123, 124 (416 SE2d 102) (1992) ("The purpose of OCGA § 9-11-9.1 is to reduce the number of frivolous malpractice suits being filed[.]") (citation and punctuation omitted).

Finally, once the plaintiff obtains an expert affidavit to support his or her claim that the defendant violated the applicable professional standards (pursuant to OCGA § 9-11-9.1), and presents evidence of "[a]ny injury resulting from a want of such care and skill" (pursuant to OCGA § 51-1-27), determinations regarding the existence and extent of the plaintiff's injuries and whether the defendant's negligence caused those injuries are generally questions for the jury to resolve.[5] See *Pruette v. Phoebe Putney Mem. Hosp.*, 295 Ga. App. 335, 338 (1) (671 SE2d 844) (2008) ("questions regarding proximate cause are undeniably a jury question and may only be determined by the courts in plain and undisputed cases. Furthermore, in the summary judgment context, the nonmoving party is not required to produce evidence demanding judgment for that party, but only to present evidence which raises a material issue of fact.") (citations and punctuation omitted); see also *Jones v. Abel*, 209 Ga. App. 889, 895-896 (3) (434 SE2d 822) (1993) (evidence that the plaintiff was distracted from his business and suffered from depression as the result of his psychiatrist's malpractice was sufficient to send the issue of proximate cause and damages to the jury). Therefore, the trial court erred in applying the impact rule in this medical malpractice case.

2. Bruscato contends that the trial court erred in granting summary judgment to O'Brien on Bruscato's claims for damages occurring at the time he attacked his mother and thereafter on the basis that "[t]he public policy of Georgia bars any recovery for a cause of action by a person who has committed an illegal act, where the plaintiff depends upon the illegal act to establish his case." The trial court characterizes Bruscato's lawsuit as a "claim brought by a psychiatric patient against his . . . psychiatrist for failing to prevent the patient from committing murder." Finding Bruscato's conduct "unlawful and wrongful" and assuming that all of Bruscato's post-attack damages flowed from his illegal act, the court concluded

---

[5] It follows that it would constitute reversible error to grant summary judgment to the defendant under such circumstances. See OCGA § 9-11-56 (c) (standard for granting summary judgment).

that, as a matter of public policy, Bruscato's claims were "clearly barred." This was error for several reasons.

Bruscato's claims for damages are not limited to those which flow from the act of killing his mother. Bruscato's complaint seeks damages for medical malpractice, which is based upon O'Brien's actions and which encompasses damages flowing from O'Brien's alleged negligent medical treatment, including, for example, the physical and emotional injuries Bruscato experienced as a result of the ongoing deprivation of his medication. Thus, even if Bruscato is characterized as an intentional "wrongdoer," his status as such would not be a bar to his recovering for those damages that are not attributable to the alleged immoral or illegal act.

Further, under Georgia law, "a person does not become an outlaw and lose all rights by doing an illegal act." (Citation, punctuation and emphasis omitted.) *Adams v. Smith*, 129 Ga. App. 850, 852 (3) (201 SE2d 639) (1973). In this case, no court has adjudicated the issue of Bruscato's mental competence or sanity at the time he committed the crime. He was, however, found incompetent to stand trial,[6] and he has yet to be tried for the crime for which he was indicted. Moreover, should Bruscato later be found competent to stand trial, a jury may yet find him not guilty.[7] Because Bruscato has not been found guilty of the murder of his mother, he is presumed innocent. OCGA § 16-1-5. Thus, because no court has entered a judgment finding Bruscato legally responsible for his mother's murder and because the issue of his mental competence at the time of the crime has been disputed, a jury issue exists as to whether Bruscato had the requisite mental capacity to commit murder.

Moreover, the statutes the trial court and the dissent rely upon as embodying Georgia's public policy of prohibiting wrongdoers from profiting from their crimes only prevent those who "feloniously and

---

[6] In a competency proceeding, the defendant has the burden of proving incompetency by a preponderance of the evidence. *Adams v. State*, 275 Ga. 867, 867-868 (3) (572 SE2d 545) (2002). A criminal defendant is incompetent to stand trial if he is incapable of understanding the nature and object of the criminal proceedings and of assisting his attorney with his defense. Id. A finding of incompetency to stand trial does not address the defendant's culpability for the crime charged. Indeed, "a person may be sane enough to be responsible for [a] crime, and yet incapable of making his defense, and on the other hand he may have mental capacity to be placed on trial, and yet be insane within the contemplation of the law as to responsibility for a criminal act." *Brown v. State*, 215 Ga. 784, 786 (1) (113 SE2d 618) (1960).

[7] Under Georgia law, a person is insane, and shall not be guilty of a crime, if at the time of the act, omission, or negligence constituting the crime, the person did not have mental capacity to distinguish between right and wrong in relation to the criminal act or acted because of a delusional compulsion which overmastered his will to resist committing the crime. OCGA §§ 16-3-2, 16-3-3; *Foster v. State*, 283 Ga. 47, 48 (656 SE2d 838) (2008).

intentionally" kill, OCGA § 53-1-5 (a),[8] or those who commit "murder or voluntary manslaughter," OCGA § 33-25-13,[9] from sharing, respectively, in the decedent's estate or insurance policy proceeds. Further, OCGA § 17-14-31 essentially requires those who are buying the media rights to an accused's story to place the purchase money into an escrow account for the benefit of the victim or victims. The money is to be disbursed, however, "only if the accused person is eventually convicted or enters a plea of guilty[.]" OCGA § 17-14-31 (a) (3). Moreover, this statute makes special provision for disposition of the funds in those cases where the accused is unable to proceed to trial because of insanity or mental incompetence to stand trial. OCGA § 17-14-31 (e). Thus, if a public policy may be gleaned from these statutes, it is a policy that prohibits those who commit murder or voluntary manslaughter from profiting from the victim's death. These statutes, however, do not impair the rights of those who kill by accident or negligence, who kill in self-defense or pursuant to any other legal justification, or who kill while legally insane. Simply admitting to having committed a homicide does not make one a wrongdoer under Georgia law.[10]

Further, the foreign cases upon which the trial court and the dissents rely for the proposition that Bruscato is a wrongdoer who is barred from profiting from his crime on public policy grounds are inapposite. Those cases involved plaintiffs who had been convicted of the crimes for which they claimed were the result of the defendants'

---

[8] OCGA § 53-1-5 (d) further provides that a "final judgment of conviction or a guilty plea for murder, felony murder, or voluntary manslaughter is conclusive in civil proceedings under this Code section. In the absence of such a conviction or plea, the felonious and intentional killing must be established by clear and convincing evidence."

[9] This Code section also provides that "[a] plea of guilty or a judicial finding of guilt not reversed or otherwise set aside as to any of such crimes shall be prima- facie evidence of guilt in determining rights under this Code section." Absent such proof, in order to obtain summary judgment under this statute, the undisputed evidence must show as a matter of law that the alleged wrongdoer committed either murder or voluntary manslaughter. *Cantera v. American Heritage Life Ins. Co.*, 274 Ga. App. 307, 310-312 (7) (617 SE2d 259) (2005).

[10] In fact, we can imagine a number of scenarios where, under the dissents' analysis, a deserving plaintiff would be denied any recovery. Imagine, for example, a bipolar teenager with no history of violence who, upon receiving the wrong medication from a medical professional, suffers a hallucinatory, delusional mania — a rare but known side effect of the medication received. While in that delusional state, the child kills her brother, believing that he is a home invader bent on raping and killing her. While delusional, she perceives her act as one of self-defense. When she recovers from the effects of the medication, she realizes her mistake and, profoundly traumatized and remorseful, admits killing her brother. A jury would likely acquit her of murder, if she is even indicted. Yet, under the dissents' analysis, she is a wrongdoer for whom the civil law offers no remedy for the loss of her brother. The dissent has not only created a class of people who have limited recourse against negligent medical professionals, they have stigmatized as immoral those mentally ill people who, for reasons which may be entirely beyond their control, commit violent acts.

negligence[11] or who were found to have knowingly and intentionally participated in the crimes that proximately caused their injuries.[12] In each of these cases, a court found that the plaintiff had the requisite criminal intent to commit the crime. Moreover, none of those cases stand for the proposition that a psychiatric patient who kills while lacking the mental capacity to form the requisite criminal intent for murder or voluntary manslaughter is barred from bringing a medical malpractice action against his psychiatrist.

However, in a series of cases involving negligence suits against psychiatrists for harm caused by their patients, either to themselves or others, this Court has recognized that a patient's psychiatric disorder may prevent him from having the mental capacity to exercise control over his intentional behavior or, at least, from exercising a reasonable degree of care in order to prevent himself from harming others. See *Brandvain v. Ridgeview Institute*, 188 Ga. App. 106, 117 (3) (c) (372 SE2d 265) (1988) ("[A] patient may be so mentally ill that, as a matter of law, he is not held to exercise any degree of care for himself, and, therefore, cannot be contributorily negligent.") (citation omitted); *Swofford v. Cooper*, 184 Ga. App. 50, 54 (4) (360 SE2d 624) (1987) (Because the plaintiff was psychotic when he stabbed his father, and had been declared incompetent to stand trial, "he could not have been held to the exercise of any degree of diligence.") (citation and punctuation omitted); *Misfeldt v. Hosp. Auth. of Marietta*, 101 Ga. App. 579, 581-584 (115 SE2d 244) (1960) (It was error for the trial court to direct a verdict in favor of the hospital because the evidence of the patient's mental illness and the reasonableness of the steps taken by the hospital to protect her from herself were disputed and for the jury.); *Emory Univ. v. Lee*, 97 Ga. App. 680, 702 (6) (104 SE2d 234) (1958) (physical precedent only) ("If the evidence in the case sub judice conclusively proved that the plaintiff was on the occasion when he was injured entirely bereft of reason, it is obvious that he could not have been held to the exercise of any degree of diligence.").

As we explained in *Brandvain v. Ridgeview Institute*, the fact

---

[11] See *Cole v. Taylor*, 301 NW2d 766 (Iowa 1981) (convicted of murder); *Veverka v. Cash*, 318 NW2d 447 (Iowa 1982) (convicted of murder); *Glazier v. Lee*, 429 NW2d 857 (Mich. Ct. App. 1988) (convicted of voluntary manslaughter); *Moss v. Mid-South Hosp.*, 1989 WL 134666 (Tenn. Ct. App. 1989) (convicted of murder); *Feltner v. Casey Family Program*, 902 P2d 206 (Wyo. 1995) (convicted of sexual assault); *Burcina v. City of Ketchikan*, 902 P2d 817 (Alaska 1995) (convicted of arson); *Hines v. Bick*, 566 S2d 455 (La. Ct. App. 1990) (convicted of manslaughter).

[12] *Barker v. Kallash*, 468 NE2d 39 (N.Y. 1984) (juvenile's injuries occurred during his intentional violation of the law prohibiting possessing fireworks); *Orzel v. Scott Drug Co.*, 537 NW2d 208 (Mich. 1995) (defendant's injury was caused, in part, by his intentional violation of the law prohibiting possession and use of controlled substances).

that a patient's illegal act was volitional does not necessarily mean that it was a rational act for which the patient alone was responsible or which relieved the physician or the hospital of its duty to the patient. 188 Ga. App. at 118-119 (3) (c). In this case, Bruscato has not been convicted of murder, nor has any court entered a judgment finding him mentally competent at the time of the crime. Further, the evidence below does not establish, as a matter of law, that Bruscato was mentally competent when he killed his mother. Bruscato is not a "wrongdoer" whose status as such would be a bar to any of his claims. Consequently, summary judgment on this issue or any issue relating to Bruscato's contributory negligence for causing his mother's death is not authorized by the evidence, and, therefore, the trial court erred in granting summary judgment in O'Brien's favor on this basis.

*Judgment reversed. Miller, C. J., Barnes, P. J., and Phipps, P. J., concur. Johnson and Doyle, JJ., concur specially in part and dissent in part. Andrews, P. J., dissents.*

DOYLE, Judge, concurring specially in part and dissenting in part.

I agree fully with Division 1 of the majority opinion. In addition, even though the impact rule does not apply to Bruscato's medical malpractice claim, I note that the expert testimony of Roy Neil Johnston, M.D., that Bruscato suffered a physical injury upon the discontinuation of his anti-psychotic medication by Dr. O'Brien, would create a question of fact on this issue.

With respect to Division 2, I dissent in part because in this instance, public policy[13] prohibits Bruscato from recovering for damages arising out of the death of his mother for the reasons set forth in Division 2 of Presiding Judge Andrews's dissent. There is no dispute that Bruscato killed his mother. On May 1, 2003, Bruscato pleaded that he was mentally incompetent to stand trial, and the trial court entered a consent order finding him mentally incompetent to stand trial. As pointed out in Presiding Judge Andrews's dissent, Bruscato's defense of mental incompetence "admits the doing of the act charged."[14]

---

[13] Cf. OCGA § 53-1-5 (a) ("An individual who feloniously and intentionally kills or conspires to kill or procures the killing of another individual forfeits the right to take an interest from the decedent's estate and to serve as a personal representative or trustee of the decedent's estate or any trust created by the decedent."); OCGA § 17-14-31 (addressing distribution of profits received as a result of the commission of a crime).

[14] (Punctuation omitted.) *Brown v. State*, 267 Ga. 350, 351 (2) (478 SE2d 129) (1996) ("An affirmative defense is a defense that admits the doing of the act charged but seeks to justify, excuse or mitigate it."). See also *Kelley v. State*, 235 Ga. App. 177, 179 (1) (509 SE2d 110) (1998) ("A plea of not guilty by reason of insanity is a plea of confession and avoidance — it

Further, Bruscato admitted in his complaint that because "he was psychotic, out of touch with reality, and had severely diminished impulse control on August 15, 2002, *when [his] mother . . . attempted to discipline [him] by withholding privileges . . . [, Bruscato] picked up a battery charger and smashed his mother in the head and then stabbed her over 70 times with a knife,*" resulting in her death.[15] When questioned by the arresting officers, Bruscato admitted that he initially hid the knife he used to stab his mother, and he also admitted to killing her, stating that he knew it was wrong, but that the devil had told him to do it. Bruscato also asked "if a doctor had taken him off medication, and the act of taking him off the medication had made him violent, would the doctor or the person who committed the violent act[ ] be responsible for that act." Under these facts, it is not necessary to further establish Bruscato's responsibility for the death of his mother in order to preclude his recovery for his mother's death. In this tort action, there is no and will never be any dispute that Bruscato killed his mother.

As set forth in Bruscato's complaint, however, his damages include "suffering through a psychotic break with reality caused by Dr. O'Brien withdrawing [Bruscato]'s anti-psychotic medication." These damages are not limited to the time period prior to Bruscato's attack on his mother and do not necessarily flow from the act of killing his mother. Thus, our determination — that public policy bars Bruscato's recovery as to any damages that flow from his act of killing his mother — would not bar his recovery for those damages, if any, that are not attributable to that act, regardless of timing. Nevertheless, the trial court's grant of summary judgment as to his claim seeking to recover for the damages arising from his act of killing his mother was appropriate and should be affirmed.

I am authorized to state that Judge Johnson joins in this opinion.

ANDREWS, Presiding Judge, dissenting.

This is the second appearance of this case before us. In *Bruscato v. Gwinnett-Rockdale-Newton Community Svc. Bd.*, 290 Ga. App. 638 (660 SE2d 440) (2008), this Court affirmed a grant of summary judgment in Vito Bruscato's wrongful death action against Dr. O'Brien for failing to protect Vito's wife, also Victor's mother, from

---

admits the facts pleaded in the indictment, but avoids conviction because of the condition of insanity of the defendant at the time of the offense.") (punctuation omitted). As Bruscato admitted in his brief in opposition to summary judgment, he "was charged with murder in his mother's death but has been repeatedly *adjudicated* incompetent to stand trial." (Emphasis supplied.)

[15] (Emphasis supplied.)

Victor's psychosis, the results of which included the mother's death at her son's hand. Today, this majority holds that Dr. O'Brien's withholding of medication, resulting in the resurgence of Victor's preexisting psychosis, amounts to a "physical injury" sufficient to ground Victor's *own* emotional distress claim. This result eviscerates the longstanding Georgia rule that a plaintiff seeking damages for emotional distress caused by a defendant's negligence must show that he suffered "physical injury." The majority also runs afoul of the widely recognized public policy against rewarding wrongdoers when, under the guise of granting relief for his "pain and suffering," it authorizes Victor Bruscato to profit from the killing of his own mother. For both of these reasons, I dissent.

1. With a single exception marked out by our Supreme Court in *Lee v. State Farm &c. Ins. Co.*, 272 Ga. 583 (533 SE2d 82) (2000), Georgia law has always rejected any claim for negligent infliction of emotional distress arising from a mere physical impact. Instead, and for more than a century, Georgia law has required that a plaintiff claiming emotional distress as a result of a defendant's negligence, *including medical malpractice*, must show either physical injury or monetary loss. See, e.g., *Chapman v. Western Union Telegraph Co.*, 88 Ga. 763 (15 SE 901) (1892); *OB-GYN Assoc. v. Littleton*, 259 Ga. 663 (386 SE2d 146) (1989) (*Littleton II*) and *OB-GYN Assoc. v. Littleton*, 261 Ga. 664 (410 SE2d 121) (1991) (*Littleton IV*) (mother of child who died shortly after birth could bring claim for only that portion of her emotional distress caused by her own physical injuries); *Owens v. Gateway Mgmt. Co.*, 227 Ga. App. 815, 816 (490 SE2d 501) (1997) (lost wages were insufficient to ground emotional distress claim).

*Littleton II*'s discussion of the impact rule featured its overruling of *Christy Bros. Circus v. Turnage*, 38 Ga. App. 581 (144 SE 680) (1928), which sustained an emotional distress claim by a woman into whose lap a circus horse had defecated. As *Littleton* noted, Prosser had singled out *Christy Bros.* as an absurd extension of the impact rule. *Littleton II*, 259 Ga. at 666 (2), citing Prosser & Keeton, Law of Torts, 5th ed., § 54, p. 364; see also Prosser, 3d ed., § 51, p. 351 (1964). Likewise, although *Littleton II* was overruled in part by *Lee v. State Farm &c. Ins. Co.*, 272 Ga. 583, the *Lee* court noted *Littleton II*'s overruling of *Christy Bros.* with approval. *Lee*, 272 Ga. at 585 (I).

The import of this line of cases is perfectly clear: neither a mere *impact* nor the mere aggravation of some *preexisting* mental condition, but only a new *physical injury*, can authorize a claim for mental distress arising from a defendant's negligent act. It is nonsensical for this majority to assert that O'Brien's withholding of medication from Bruscato could result in any new "physical injury" to him; rather, O'Brien's withholding of medication resulted only in the resurgence

of Bruscato's *preexisting* mental illness, which could never be the legal responsibility of O'Brien or anyone else. When it thus misapplies the ultra-refined techniques of modern biochemistry to the clear and venerable legal rule requiring "physical injury" for emotional distress claims, the majority stages a return to the absurdity of *Christy Bros.*

The majority also exceeds its authority when it argues against the "physical injury" rule for reasons of policy (the prevention of a flood of litigation, a concern about fraudulent claims, and the difficulty of proving a causal connection between negligent conduct and an emotional distress claim) and for a foreseeability rule. As the Supreme Court held in *Lee*, however, *"the benefits of an impact rule are plain in that it provides a brighter line of liability"* as well as "a clear relationship" between a plaintiff's status as a victim of negligence and her right to compensation. (Emphasis supplied.) 272 Ga. at 587 (II). This explicit confirmation of the bright line rule requiring physical injury should foreclose *any* policy discussion of the question by *any* judge on this Court. Instead, and until further notice, this majority renders *any* arguably negligent act causing *any* observable change in brain chemistry preceding *any* catastrophic event which *any* plaintiff's expert later testifies to be the proximate result of the negligent act as authorizing a jury to award *any* amount its enlightened conscience finds appropriate. I cannot condone this result or the rationale used to reach it.

2. Although the issue has not previously arisen in Georgia, the well-developed rule in other jurisdictions is that public policy bars a wrongdoer's emotional distress claim arising from his own immoral act. This is so even when, as in this case, the wrongdoer does not possess the mens rea to establish legally sufficient culpability for that act.

In the leading case of *Cole v. Taylor*, 301 NW2d 766 (Iowa 1981), the Iowa Supreme Court barred a killer's action against her treating psychiatrist as follows:

> [A] person cannot maintain an action if, in order to establish his cause of action, he must rely, in whole or in part, on an *illegal or immoral* act or transaction to which he is a party, *or to maintain a claim for damages based on his own wrong* or caused by his own neglect, . . . *or* where he must base his cause of action, *in whole or in part*, on a violation by himself of the criminal or penal laws.

(Citations and punctuation omitted; emphasis supplied.) Id. at 768 (II). Any of these categories of wrongfulness, in other words, should be sufficient to bar recovery. Shortly after *Cole*, moreover, a second

Iowa decision held that because an arsonist and felony murderer's proof of diminished capacity provided no basis for avoiding the *Cole* rule, a trial court should have granted summary judgment to his doctor concerning his tort claim. *Veverka v. Cash*, 318 NW2d 447, 450-451 (Iowa 1982). Since then, *Cole* has been recognized as the majority American rule among the few courts to have considered the issue. *Feltner v. Casey Family Program*, 902 P2d 206, 208 (Wyo. 1995); see also *Glazier v. Lee*, 429 NW2d 857 (Mich. App. 1988) (applying *Cole* to bar plaintiff's claim against his psychiatrist in the wake of plaintiff's killing of his girlfriend); *Hines v. Bick*, 566 S2d 455, 459-462 (La. App. 1990) (same).

It is true that the *Cole* and other plaintiffs were found guilty of the murder before bringing their tort suits, whereas Bruscato has been found mentally incompetent to stand trial in the killing of his mother. As other courts have held, however, the *Cole* rationale applies *even where a plaintiff may not be held criminally responsible for his conduct*. Thus the New York Court of Appeals barred a claim by a fifteen-year-old against a nine-year-old for supplying the former with firecrackers, holding that "[a]lthough the plaintiff may not be held criminally responsible for his conduct, the fact remains that constructing a bomb is prohibited by law." *Barker v. Kallash*, 468 NE2d 39, 42 (N.Y. 1984) (citing *Cole*).

It is also true that "[a]n individual who feloniously and intentionally kills" another person "forfeits the right *to take an interest from the decedent's estate*." (Emphasis supplied.) OCGA § 53-1-5 (a). Although this statute expresses the General Assembly's disapproval of a wrongdoer profiting from his wrongful act, the majority uses it to justify the validity of a tort claim brought by a person who does not possess the requisite mens rea against a decedent's estate. The statute has no application to Bruscato's garden variety tort claim, however, because that claim is not an inheritable "interest" under the Probate Code.

In short, even if Bruscato has been legally *excused* from the consequences of his actions, his defense of mental incompetence necessarily "admits the doing of the act charged." *Brown v. State*, 267 Ga. 350, 351 (478 SE2d 129) (1996). Georgia's public policy against allowing wrongdoers to profit from their wrongful acts expresses the law's legitimate repugnance at Bruscato's recovery of *any* damages, under *any* theory, for his emotional distress claim. As the *Cole* court succinctly put the matter: "We reject plaintiff's theories of recovery, not because they cannot be rationalized, but because they cannot be justified." 301 NW2d at 768 (II).

As previously stated, I also believe that the "physical injury" component of Georgia's longstanding impact rule bars recovery for any preexisting mental condition which reappears as a result of a

doctor's withholding of medication. Because either of these reasons would be sufficient to affirm the trial court's grant of summary judgment, I dissent to both divisions of the majority opinion.

DECIDED DECEMBER 1, 2010 —
RECONSIDERATION DENIED DECEMBER 16, 2010 — 

*William G. Quinn III, Jerry D. McCumber*, for appellant.
*Owen, Gleaton, Egan, Jones & Sweeney, Milton B. Satcher III, Laura C. Marshall*, for appellee.