## S11G0660. O'BRIEN v. BRUSCATO.
(715 SE2d 120)

MELTON, Justice.

In *Bruscato v. O'Brien*, 307 Ga. App. 452 (705 SE2d 275) (2010), the Court of Appeals held that Victor Bruscato was entitled to continue pursuing a claim for medical malpractice against his psychiatrist, Dr. Derek O'Brien, based at least in part on an argument that Bruscato brutally killed his mother as a result of deficient psychiatric treatment from O'Brien. Following the murder, Bruscato, through his guardian, brought a malpractice claim against O'Brien, and the trial court granted summary judgment in favor of

O'Brien. The trial court ruled, among other things, that public policy would not allow Bruscato to benefit from his wrongdoings, namely the murder of his mother. The Court of Appeals reversed, and we subsequently granted certiorari to determine whether the Court of Appeals properly ruled that Bruscato's claim for damages is not barred by Georgia public policy. For the reasons set forth below, we affirm.

As found by the Court of Appeals, the facts[1] in this case are as follows:

> O'Brien began treating Victor Bruscato, a then 38-year-old, mentally ill patient with a history of violence, in January 2001. O'Brien reviewed Bruscato's treatment records, which revealed that Bruscato's mental illness manifested in childhood and that he had been diagnosed over the course of his life with mental retardation, organic mood disorder, pervasive developmental disorder, schizophrenia, a nonspecified psychotic disorder, pedophilia, and intermittent explosive disorder. Bruscato had expressed homicidal thoughts toward his parents, and he had physically assaulted them and others, including a hospital employee and a young girl. He had also experienced auditory hallucinations that commanded him to kill people or to molest girls.

> When O'Brien began treating Bruscato, Bruscato had been living with his parents for almost two years. Before that, he had been living in a group home operated by the Gwinnett-Rockdale-Newton Community Service Board ("CSB"), but he had been removed from the home because of the risk that he might sexually assault a girl. Bruscato's expert witness opined that his elderly parents were ill-equipped to manage a severely mentally-ill adult and were "strong-armed" into taking him home. While at home, Bruscato continued receiving outpatient treatment from the CSB. Bruscato's expert witness opined that the medications the CSB staff administered to Bruscato controlled his violent behavior and sexual impulses. O'Brien knew that, because Bruscato was potentially dangerous, the CSB required his parents to monitor him continuously.

> In late May 2002, O'Brien ordered that two of Bruscato's medications, Zyprexa and Luvox, be discontinued for six

---

[1] Because this case requires the review of the trial court's grant of O'Brien's motion for summary judgment, the facts are set forth in the light most favorable to Bruscato, the nonmovant.

weeks to rule out the possibility that Bruscato might be developing neuroleptic malignancy syndrome ("NMS"). O'Brien's own expert witness opined that, if Bruscato had NMS, which the expert believed he did not, the proper procedure would be to hospitalize him. He also opined that withholding Bruscato's medications for that period to rule out the possibility of NMS, which is very rare, was not medically justified.

According to a family friend, about two-and-a-half weeks after Bruscato stopped taking Zyprexa and Luvox, he began having nightmares, panic attacks, and bouts of heavy sweating. He also started hearing voices telling him to kill, and he became increasingly hostile toward his parents. On July 22, O'Brien met with Bruscato briefly and noted that he spoke rapidly, seemed excited, and was feeling angry at women. O'Brien, however, did not make any changes to Bruscato's treatment plan. On August 11, Bruscato scrawled a "prayer note," stating: "[I] need prayer big time devil tormenting me." O'Brien opined in his deposition that the letter "could convey psychosis." On August 14, a friend visiting Bruscato's home observed him rocking back and forth on his bed, pleading for the voices in his head to leave him alone. A nurse, who also visited on the same day, noted that Bruscato was argumentative, was expressing thoughts about sexual fantasies and dreams, and was generally irritable.

On August 15, Bruscato crushed his mother's skull with a battery charger and stabbed her 72 times, killing her. When questioned by the arresting officers, Bruscato said that he killed his mother and that he knew it was wrong, but that the devil had told him to do it. After Bruscato was jailed, the assistant director of prison mental health services wrote Bruscato's criminal defense attorney. She advised him that, when Bruscato was arrested, he had been "non-compliant with his anti-psychotic medications," and, during his intake assessment, he had reported auditory hallucinations that were "persecutory in nature," that he had trouble controlling his impulses, and that he had very poor insight into his situation, asking "what member of his family would become his new mother." Bruscato wondered whether his mother could be "brought back to life." After reintroducing Zyprexa into Bruscato's medication regimen, the director noted that he became "compliant" and that his condition "improved steadily." Although Bruscato was indicted for his mother's murder in 2002, he was found to be

incompetent to stand trial. As of the date of the trial court's summary judgment order in the instant case, Bruscato has been residing at Central State Hospital, where he had been committed.

Bruscato's expert witness opined that when O'Brien "abruptly terminated [Bruscato's] Zyprexa, not only was this a violation of the standard of care required of Dr. O'Brien, it resulted in the imposition of chemical changes in [Bruscato's] brain. Those chemical changes in turn produced adverse physical responses in [Bruscato's] brain and ultimately in his body." The expert stated that Bruscato's mental illness was not merely emotional or behavioral, but neurological—"a medical disorder." The expert further opined that the chemical changes that resulted from withholding medication caused Bruscato to "decompensate" and experience the return of the most severe symptoms of his medical disorder, including auditory command hallucinations, agitation, and hostility. The expert concluded that O'Brien's treatment "manifested gross negligence and a disregard of the consequences of leaving a historically violent and potentially psychotic patient unmedicated," which ultimately led to Bruscato's killing his mother while in a psychotic state.

Id. at 453-455.

After reviewing this case, we believe that the public policy issues were correctly examined and determined by the Court of Appeals, and we generally adopt the Court of Appeals' analysis. In most circumstances, one may not profit from his own act of wrongdoing. Therefore, when one knowingly commits a wrongful act, he cannot use this act for personal gain. There may be situations, however, when an individual's psychiatric disorder prevents him from exercising a reasonable degree of care to prevent himself from taking improper and illegal actions. See, e.g., *Brandvain v. Ridgeview Institute*, 188 Ga. App. 106, 117 (3) (c) (372 SE2d 265) (1988) ("[A] patient may be so mentally ill that, as a matter of law, he is not held to exercise any degree of care for himself, and, therefore, cannot be contributorily negligent.") (citation omitted). See also *Swofford v. Cooper*, 184 Ga. App. 50, 54 (4) (360 SE2d 624) (1987) (defendant who was psychotic at time of crime and had been declared incompetent to stand trial "could not have been held to the exercise of any degree of diligence.") (citation and punctuation omitted).

In this case, a question of fact remains whether Bruscato knowingly committed a wrongful act. There is no question that Bruscato killed his mother. That much has been admitted. There is

considerable question, however, regarding Bruscato's sanity and competency at the time the wrongful act was committed. At present, although Bruscato has been indicted, he has not been tried for the murder of his mother, and no jury has found him guilty of the crime. Therefore, as the Court of Appeals found:

> [B]ecause no court has entered a judgment finding Bruscato legally responsible for his mother's murder and because the issue of his mental competence at the time of the crime has been disputed, a jury issue exists as to whether Bruscato had the requisite mental capacity to commit murder.

*Bruscato*, supra, 307 Ga. App. at 459 (2). As a result, at this moment in time, it cannot be said that, should Bruscato's claim against O'Brien be successful, he might profit from *knowingly* committing a wrongful act. Concomitantly, then, O'Brien's motion for summary judgment based on such an argument cannot succeed.[2] The foreign cases relied upon by O'Brien, including *Cole v. Taylor*, 301 NW2d 766 (Iowa 1981), do not alter this outcome, as those cases involved defendants who had already been convicted of the crimes forming the basis of their psychiatric malpractice claims.[3]

Moreover, as pointed out by the Court of Appeals, Bruscato's lawsuit is not wholly related to his act of murder, and it is not wholly designed to profit from that act. To the contrary, his lawsuit relates to the allegedly improper medical treatment he received from O'Brien and seeks damages for the suffering it caused to *him*. In this sense, Bruscato is not seeking to profit from the murder of his mother, he is seeking damages to be made whole from the allegedly improper treatment he received from O'Brien. Therefore, again, a grant of summary judgment to O'Brien based on the principle that one cannot profit from knowing misdeeds is not warranted under the facts of this case.

*Judgment affirmed. All the Justices concur.*

DECIDED SEPTEMBER 12, 2011.

---

[2] This result coheres with our recent decision in *Levenson v. Word*, 286 Ga. 114 (686 SE2d 236) (2009). In that case, this Court held that, in order for the "slayer statute," see OCGA § 53-1-5 (a), to bar an inheritance, there must be a judicial finding either by criminal conviction or in a civil trial by clear and convincing evidence, that the person to be precluded from recovery feloniously and intentionally killed the deceased. We do not reach, however, the applicable burden of proof required by a defendant to show wrongdoing by a plaintiff in cases such as this.

[3] Although O'Brien cites *Lingle v. Berrien County*, 522 NW2d 641 (Mich. Ct. App. 1994), which superficially appears to support his position, that case is only a short per curiam decision which contains no reasoning and lacks any persuasive authority.

*Owen, Gleaton, Egan, Jones & Sweeney, Laura C. Marshall, Milton B. Satcher III*, for appellant.

*Willis & Quinn, William G. Quinn III, Jerry D. McCumber*, for appellee.